**07 CV 6011**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**W.P.**

ROGER REIFF, individually and on behalf of all others similarly situated,

        Plaintiff,

    v.

FRANK A. METZ, JR., SHEILA FELDMAN, HELEN L. NELLING, SUSAN E. BEVINGTON, NANCY STEMME, CHRISTOPHER N. AST, EMPLOYEE BENEFITS PLAN COMMITTEE, PENSION AND SAVINGS FUND COMMITTEE, JOHN HUNTER, ROBERT CLAUSEN, ROBERT POTTER, MICHAEL E. MILLER, PAUL H. HATFIELD, J. PATRICK MULCAHY, SALLY G. NARODICK, PAUL DONOVAN, ROBERT H. JENKINS, WILLIAM D. RUCKELSHAUS, JOHN B. SLAUGHTER, PHILIP R. LOCHNER, JR., ROBERT T. BLAKELY, NORTHERN TRUST COMPANY, and JOHN DOES 1-100.

        Defendants.

No. _____

**CLASS ACTION COMPLAINT**

**JURY DEMANDED**

Plaintiff, by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon the investigation made by and through his attorneys:

## I.  NATURE OF THE ACTION

1.    This is a class action for multiple breaches of fiduciary duty brought pursuant to §502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132, to recover millions of dollars of losses to the Solutia Inc. Savings and Investment Plan (the "SIP" or the "Plan"), and its participants and beneficiaries (collectively, "participants"), during the period September 1, 1997 to December 15, 2003 (the "Class Period"), arising from the imprudent investment of Plan assets in the common stock of Solutia, Inc. ("Solutia" or the "Company").

2.    During the Class Period, Solutia common stock ("Solutia Stock") was an imprudent investment since it was both artificially inflated in price and too speculative to serve as a retirement investment.   However, despite its precarious financial condition, and despite the fact that Plan fiduciaries knew or should have known that Solutia Stock was not a prudent investment option, the fiduciaries continued to invest in Solutia Stock and maintained funds that invested in Solutia Stock until just *two days* before the Company declared bankruptcy.

3.    The claims of Plaintiff and the Class he seeks to represent arise from the failure of Plan fiduciaries to act solely in the interest of Plan participants and to exercise the required care, skill, prudence and diligence in administering the Plan.  These fiduciaries include Solutia (which is not a defendant because it is currently in Chapter 11 bankruptcy proceedings), the Employee Benefits Plan Committee and its members (the "Plan Committee"), the Pension and Savings Fund Committee and its members (the "Fund Committee"), Sheila Feldman, Helen L. Nelling, Susan E. Bevington,

Nancy Stemme, and Christopher N. Ast, as well as certain Directors and Officers who were also Plan fiduciaries.

4.    The Northern Trust Company ("Northern Trust"), which served as the Plan's Trustee, is also responsible for losses to the Plan.  Northern Trust continued to purchase and hold Solutia Stock when it knew or should have known that such investment was not a prudent retirement investment, and accepted directions to purchase and hold Solutia Stock when it knew or should have known that such directions were not prudent and in the best interests of the Plan's participants.

5.    The Defendants and other co-fiduciaries violated their fiduciary obligations to the Plan under ERISA §§404 and 405, 29 U.S.C. §§1104 and 1105 by, among other things:

a.    failing to prudently manage the assets of the Plan by continuing to purchase and hold shares of Solutia Stock when they knew or should have known that Solutia Stock was inflated in price and too speculative to be a prudent retirement investment;

b.    continuing to offer the Solutia Stock Fund as an investment option, and continuing to provide company match contributions in the form of Solutia Stock, when Solutia Stock was inflated in price and too speculative to be a prudent retirement investment;

c.    failing to alter the mix of investments in the Solutia Stock Fund to favor cash as opposed to Solutia Stock;

d.    failing to disregard Plan documents and/or directives when they knew or reasonably should have known that following them would lead to an imprudent result or otherwise harm the Plan participants;

e.    failing to prevent others whom they direct, or who are directed by the Plan, to follow Plan documents and/or directives when following them was imprudent and would harm plan participants;

f.    failing to properly monitor the Plan's fiduciaries to ensure that they were prudently and loyally serving the interests of Plan participants and, in connection therewith, failing to remove and replace fiduciaries whom they knew or should have known were acting disloyally and imprudently with respect to the Plan and its assets;

g.     failing to provide complete and accurate information to the Plan's participants necessary for the participants to make informed decisions with regard to the continuing investment in Solutia Stock; and

h.     failing to avoid conflicts of interests and to resolve them promptly when they occurred by, e.g., appointing an independent fiduciary to make decisions regarding Plan investments in Solutia Stock.

6.     Plaintiff alleges that Defendants' breaches of fiduciary duty with respect to the Plan's holding and acquisition of Solutia Stock resulted in losses to the Plan which the Defendants are personally liable to make good to the Plan pursuant to ERISA §§409 and 502(a)(2), 29 U.S.C. §§1109 and 1132(a)(2).

7.     Because Plaintiff's claims apply to the Plan as a whole, because all Plan participants are eligible to have the Plan make investments on their behalf in Solutia Stock, and because ERISA authorizes Plan participants such as Plaintiff to sue for plan-wide relief for breaches of fiduciary duty, Plaintiff brings this action on behalf of himself, the Plan and all Plan participants during the Class Period.

8.     Because the information and documents (including Plan documents) on which Plaintiff's claims are based are for the most part solely in the possession of the Defendants, or Solutia, certain of Plaintiff's allegations are by necessity upon information and belief. Plaintiff seeks the opportunity to conduct discovery, and thereafter, to the extent necessary and appropriate, for leave to amend to add additional facts and parties.

## II. JURISDICTION AND VENUE

9.     **Subject Matter Jurisdiction.** This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA §502(a), 29 U.S.C. §1132(a). This Court has original and

exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA 502(e)(1), 29 U.S.C. §1132(e)(1).

10.    The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1334(b), in that this action is "related to" a case under Title 11, namely *In re Solutia Inc., et al.*, 03-B-17949 (PCB) (S.D.N.Y.).  Plaintiff has filed a class proof of claim in that bankruptcy action on behalf of the Plan and its participants.

11.    **Personal Jurisdiction.**  ERISA provides for nation-wide service of process. ERISA §502(e)(2), 29 U.S.C. §1132(e)(2).  All of the Defendants are residents of the United States. Accordingly, this Court has personal jurisdiction over them.

12.    **Venue.**  Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because some of the fiduciary breaches for which relief is sought occurred in this District, because Defendant Metz resides in this District and because Northern Trust has offices and can be found here.  Additionally, Solutia's bankruptcy proceeding is in this District.

### III.  THE PARTIES

*Plaintiff*

13.    Plaintiff **Roger Reiff ("Reiff")** is a citizen of the State of Illinois and an employee of Solutia. Reiff is a "participant" in the Plan pursuant to ERISA §3(7), 29 U.S.C. §1102(7), and brings this action to recover losses to the Plan.  Shares of Solutia Stock were purchased and held in the Plan for the benefit of Reiff.  Reiff continues to have an account balance in the Plan.

*Defendants*

**The Committee Defendants**

14.     Defendant **Employee Benefits Plan Committee ("Plan Committee"),** is a named fiduciary of the Plan and is charged with administering the Plan. The Plan Committee is appointed by the Company's Board of Directors or Chief Executive Officers and consists of at least three members. The Plan Committee includes it members.

15.     Defendant **Pension and Savings Fund Committee ("Fund Committee")** is a named fiduciary of the Plan and is charged with the authority to manage and control the Plan assets. The Fund Committee is appointed by the Company's Board of Directors. The Fund Committee includes it members.

16.     The Plan Committee and its members, as well as the Fund Committee and its members, are collectively referred to herein as the **"Committee Defendants."**

**Plan Defendants**

17.     Defendant **Sheila Feldman ("Feldman")** was the Chairman of the Plan Committee from at least June 25, 1999 through December 27, 2002, and signed the Plan's Form 11-Ks for the years ended 1998 and 2001 (respectively, the "SIP 1999 11-K" and "SIP 2001 11-K), on those dates. Feldman also served as Vice President of Human Resources and Public Affairs at Solutia since 1997, and was the director of Human Resources at Monsanto Business Services and Stewardship, from 1995 until 1997.

18.     Defendant **Helen L. Nelling ("Nelling")** is identified as the Plan Administrator in the Plan's Annual Report Form 5500 for the year 2001 (the "SIP 2001 Annual Report"), and signed the SIP 2001 Annual Report on October 15, 2002, as the Plan Administrator.

19.     Defendant **Susan E. Bevington (aka Susan E. Berington) ("Bevington")** is identified as the Plan Administrator in the Plan's Annual Report on Form 5500 for the year 2002 (the "SIP 2002 Annual Report"), and signed the SIP 2002 Annual Report on October 15, 2003, as the Plan Administrator.  (Her last name appears as Berington on the SIP 2002 Annual Report.) Bevington was the Chairman of the Plan Committee and signed the Plan's Form 11-K for the year ended 2002 (the "SIP 2002 11-K"), on June 26, 2003.  (Her name appears as Bevington on the SIP 2002 11-K).  Bevington was named as a vice president of Solutia on February 26, 2003.

20.     Defendant **Nancy Stemme ("Stemme")** is identified as the Plan Administrator in the Plan's Annual Report on Form 5500 for the year 2003 (the "SIP 2003 Annual Report"), and signed the SIP 2003 Annual Report on October 7, 2004, as the Plan Administrator.[1]

21.     Defendant **Christopher N. Ast ("Ast")** was identified as the representative of the Plan, and Director of Employee Benefits at Solutia.  Ast signed the Plan's Form 11-K for 2003 (the "SIP 2003 11-K"), on June 25, 2004.

22.     Defendants Feldman, Nelling, Bevington, Stemme and Ast are referred to herein as the "**Plan Defendants**."

**The Director Defendants**

23.     Defendant **John Hunter ("Hunter")** served, during the Class Period, as Chairman, President and Chief Executive Officer ("CEO") of Solutia.  Hunter served as President and Chief Operating Officer of Solutia beginning in September 1997, became CEO in May 1999, and became

---

[1]     Based on representations made by counsel to certain Defendants, Stemme joined Solutia on or about June 21, 2004.  If discovery verifies that Stemme joined Solutia on or about June 21, 2004, Stemme's liability will be limited to those breaches that took place after her employment at Solutia.  *See, e.g., infra* ¶ 288(g) and (h).

Chairman on December 1, 1999. Hunter retired from Solutia, effective on May 31, 2004. Hunter was actively involved in the monitoring of Flexsys through its Supervisory Board, and the Supervisory Board reported to him both prior to the time he became CEO, and thereafter. Prior to joining Solutia, Hunter served as President of the Fibers Business Unit of Monsanto Company between 1995 and 1997. Hunter also served as Vice President and General Manager of the Fibers Division and Asia-Pacific region of The Chemical Group of Monsanto Chemical Company between 1993-1995, as well as President and General Manager of Asia-Pacific at Monsanto Chemical Company, a unit of Monsanto Company, between 1989 and 1993.

24.    Defendant **Robert Clausen ("Clausen")** served, during the Class Period, as Vice Chairman, Chief Financial Officer ("CFO") and Chief Administrative Officer. He served as Advisory Director to the Company as well as other senior executive positions from 1997 until 2003, and as a director from 2003 until his retirement from the Company on May 31, 2004. Clausen monitored Flexsys through its Supervisory Board, and the Supervisory Board reported to him, both prior to and after the time he became CFO. Clausen also served as President of Monsanto Business Services, between 1994 and 1997, as well as Vice President of Asset Management at Monsanto Company, between 1992 and 1994.

25.    Defendant **Robert Potter ("Potter")**, served, during the Class Period, as Solutia's CEO from September 1997 through the end of April 1999, and was a Director from September 1997 until December 31, 2000. Potter monitored Flexsys through its Supervisory Board, and while he served as Solutia's CEO, the Supervisory Board reported to him. Potter also served as the Chief Executive of the Chemicals Division at Monsanto Company from 1986 until that division was spun-

-7-

off to become Solutia. Potter also served as Executive Vice President at Monsanto Company since 1990, and Advisory Director at Monsanto Company since 1986.

26.      Defendant **Michael E. Miller ("Miller")**, served as a Director of the Company from 1999 until January 2002. Miller also served as Vice Chairman of Solutia since 1998, as Chief Operating Officer from 1999 to 2001, as Senior Vice President from 1997 to 1998, and as an Advisory Director from 1997 to 1999. From 1995 to 1997, Miller was President of the Specialty Products Business Unit of Monsanto Company.

27.      Defendant **Paul H. Hatfield ("Hatfield")**, served as a Director of the Company from 1997 until the present.

28.      Defendant **J. Patrick Mulcahy ("Mulcahy")**, served as a Director of the Company from 1999 until the present. Mulcahy also served as a member of the Audit and Finance Committee (the "Audit Committee").

29.      Defendant **Sally G. Narodick ("Narodick")**, served as a Director of the Company from 2000 until the present.

30.      Defendant **Paul Donovan ("Donovan")**, served as a Director of the Company from 2001 until February 2004. Donovan also served as a member of the Audit Committee.

31.      Defendant **Robert H. Jenkins ("Jenkins")**, served as a Director of the Company from 1997 until the present.

32.      Defendant **Frank A. Metz, Jr. ("Metz")**, served as a Director of the Company from 1997 until the present. Metz also served as Chairman of the Audit Committee. Metz resides in Rockland County, New York at Pierson Lakes Box 26, One Sterlington Road, Sloatsburg, NY 10974.

33.    Defendant **William D. Ruckelshaus ("Ruckelshaus")**, served as a Director of the Company from 1997 until April 2003. Ruckelshaus also served as a director of Monsanto Company.

34.    Defendant **John B. Slaughter ("Slaughter")**, served as a Director of the Company from 1997 until the present. Slaughter also served as a member of the Audit Committee.

35.    Defendant **Philip R. Lochner, Jr. ("Lochner")**, served as a Director of the Company from 2002 through 2005.

36.    Defendant **Robert T. Blakely ("Blakely")**, served as a Director of the Company from 1997 until 2001. Blakely also served as a member of the Audit Committee.

37.    Defendants Hunter, Clausen, Potter, Miller, Hatfield, Mulcahy, Narodick, Donovan, Jenkins, Metz, Ruckelshaus, Slaughter, Lochner, Blakely, are referred to herein as the **"Director Defendants**." They each served, during the Class Period, as a Director of the Company's Board of Directors (the "Board"). According to the Plan documents the Company's Board appoints the Fund Committee and the Board or Chief Executive Officers appoint the members of the Plan Committee. Some of the Director Defendants also served as executives at Monsanto Company prior to the Class Period and were aware intimately knowledgeable about the business of Monsanto Company and, in particular, its Chemicals Division and the liabilities associated therewith that was spun-off to become Solutia.

38.    Defendants Hatfield, Narodick, Jenkins, Ruckelshaus, and Lochner had no role in Solutia management other than that of Director and are referred to herein as the **"Outside Director Defendants**." The remainder of the Director Defendants (Hunter, Clausen, Potter, Miller, Mulcahy, Donovan, Jenkins, Metz, Slaughter, and Blakely) were either corporate officers or members of the Audit Committee, and are referred to herein as the **"Inside Director Defendants**."

39.     Solutia necessarily carried out many of its functions through individuals.    The Director Defendants directly managed the business and affairs of the Company as members of the Board, in addition to the Inside Director Defendants' roles as officers or members of the Audit Committee.  The Board is responsible for the appointment, removal, and, thus, monitoring of the Plan's fiduciaries, including the Committee Defendants.  The Board had ultimate decision-making authority regarding all aspects of the Plan's administration and management.    The Director Defendants are believed to be fiduciaries of the Plan in that they exercised discretionary authority and control with respect to management and administration of the Plan and authority and control regarding management and disposition of the Plan's assets.

40.     The Inside Director Defendants knew or should have known that the Plan was continuing to acquire and hold Solutia stock when Solutia was neither a sound Company nor a prudent retirement investment. The Inside Director Defendants knew or should have known that the Plan was continuing to acquire and hold Solutia stock at a time when the stock was artificially inflated in price because of an ongoing price-fixing conspiracy.  The Inside Director Defendants should have appointed an independent fiduciary to free them of their inherent conflict of interest.

41.     The Director Defendants' fiduciary duties include the appointment of other named fiduciaries. The Director Defendants, as appointing fiduciaries, are thus liable for failing to monitor the Plan's fiduciaries and for failing to provide the appointed fiduciaries with the information necessary to perform their responsibilities as Plan fiduciaries.

42.     Defendant **The Northern Trust Company ("Northern Trust")** is an Illinois corporation with its principal executive offices located in 50 South La Salle Street, Chicago, Illinois, 60675. Northern Trust was founded in 1889 to provide banking and trust services to the public, and

is a wholly-owned subsidiary of NT Corp. Northern Trust served as the Trustee of the Plan within

the meaning of ERISA §403(a), 29 U.S.C. §1103(a) and may have served as an investment manager

of the Plan. The administrative expenses of the Plan, including the payment of fees to Northern

Trust, were charged to Plan participants' accounts. On information and belief, Northern Trust does

business in this District and according to its Website maintains an office in this District at 65 E. 55th

Street, New York, New York, 10022.

43.    Defendants **John Does 1-100** are persons or entities currently unknown who were

during the Class Period[2]:

      a.     Members of the Plan Committee (not already named herein as such);

      b.     Members of the Fund Committee (not already named herein as such);

      c.     Persons designated Named Fiduciary of the Plan pursuant to the Third Party Named Fiduciary Agreement identified in section 1.1(u)(iii) of the Defined Contribution and Employee Stock Ownership Trust Agreement, dated October 29, 1998 (the "Trust Agreement");

      d.     Persons to whom responsibilities have been delegated pursuant to section 17.2 of the Trust Agreement;

      e.     Persons listed by the Company and authorized to act, among others, as a fiduciary of the Plan, pursuant to section 25.2 of the Trust Agreement;

---

[2]    On December 27, 2004, Plaintiff requested from the Plan Administrator, pursuant to section 104 of ERISA, 29 U.S.C. § 1024, (the "104 Request"), documents and information that would have disclosed the names of the John Doe Defendants contained in this paragraph. On January 26, 2004, the Plan Administrator, pursuant to Plaintiff's standing as a "participant" under section 3(7) of ERISA, 29 U.S.C. §1102(7), produced certain documents. On February 7, 2004, and thereafter, Plaintiff made additional written and oral requests to the Plan Administrator and counsel to various Defendants (including for information omitted in the January 26, 2004, production). No further documents or information has been produced. *See generally* ERISA §502(c)(1), 29 U.S.C. §1132(c)(1) (participant's right of action against the plan administrator for refusal to supply requested information).

f.  Persons to whom authority, duties or responsibilities have been delegated by the Plan Committee pursuant to section 13.3(g) of the Annex A to Solutia Inc. Savings and Investment Plan, dated April 7, 1998, and September 1, 1997 (the "SIP 1998 Plan Document");

g.  Persons to whom authority, duties or responsibilities have been delegated by the Committee Defendants pursuant to section 13.7 of the SIP 1998 Plan Document;

h.  Persons to whom authority, duties or responsibilities have been delegated by the Plan Committee pursuant to section 13.3(g) of the Solutia Inc. Savings and Investment Plan, dated January 1, 2002 (the "SIP 2002 Plan Document");

i.  Persons to whom authority, duties or responsibilities have been delegated by the Committee Defendants pursuant to section 13.7 of the SIP 2002 Plan Document; and,

j.  Other persons or entities who served as Plan fiduciaries or exercised discretionary authority with respect to the Plan.

44.    After Plaintiff has had a reasonable opportunity to conduct discovery and at such time as the identities of the John Doe Defendants are revealed, Plaintiff may seek leave to amend.

**Non-Party Solutia Inc.**

45.    **Solutia Inc. ("Solutia" or the "Company")** is a Delaware corporation established in April 1997 to hold most of the chemical businesses of the former Monsanto Company, now known as Pharmacia Corporation, a wholly owned subsidiary of Pfizer Inc. On September 1, 1997, Pharmacia spun-off Solutia by distributing Solutia's shares as a dividend to its stockholders. Solutia became an independent publicly held company as a result of the spin-off.

46.    Solutia and its subsidiaries manufacture and market a variety of high-performance chemical-based materials, which are used in a broad range of consumer and industrial applications. These materials includes plastics, water treatment chemicals, aviation hydraulic fluids, and a wide

variety of nylon products. Solutia also provides integrated pharmaceutical development services ranging from process research to manufacturing, clinical trial services and advisory services.

47.    On December 17, 2003, Solutia and its fourteen (14) U.S. subsidiaries filed voluntary petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for this District. The cases were consolidated for the purpose of joint administration and were assigned case number 03-17949 (PCB). The filing was made to restructure the Company's balance sheet by reducing indebtedness to appropriate levels, to streamline operations and reduce costs to allow the Company to emerge from Chapter 11 as a viable going concern, and to obtain relief from the negative financial impact of legacy liabilities that were transferred to it by Monsanto Company pursuant to the spin-off.

48.    Solutia is the Plan's sponsor and administrator. It is a fiduciary within the meaning of ERISA §3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i), in that it possessed and exercised discretionary authority and control with respect to the management and administration of the Plan and authority and control with respect to management or disposition of the Plan's assets.

49.    Solutia is not named as a defendant in this action because it has filed for bankruptcy protection. As a result, any action against Solutia is stayed pursuant to the bankruptcy court's automatic stay. *See* 11 U.S.C. §362. Plaintiff is asserting his claims against Solutia in the bankruptcy proceeding and may seek to lift the bankruptcy stay so that Solutia can be named as a defendant here and all related claims can be adjudicated together.

-13-

## IV. THE PLAN

**A.     Description of the Plan**

50.     The Solutia Inc. Savings and Investment Plan ("SIP" or the "Plan") was established on September 1, 1997.  It is an employee benefit plan within the meaning of ERISA §§3(3), and 3(2)(A), 29 U.S.C. §§1002(3) and 1002(2)(A), and a "defined contribution" or "individual account" Plan within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).

51.     The purpose of the Plan is to allow for participants to save money for their retirement. The first page of the Plan's Summary Plan Description states as follows:

> Your Savings and Investment Plan (SIP) is an opportunity to save.  Whatever your savings goal, saving now is important because the more time you let your money work for you, the better.  Better yet, when you save through SIP, Solutia adds to your savings with matching contributions.

52.     The Plan was modeled after the Monsanto Savings and Investment Plan (the "Monsanto Plan"), and received many former Monsanto Plan participants' accounts, as well as the assets and liabilities of the Monsanto Plan.

**1.     Investment Options**

53.     The Plan provided participants with a number of investment options.  During the Class Period, the Plan offered between 8 and 14 investment options to the Plan participants.

54.     From the Plan's inception until December 31, 2002, the Company, through its Board of Directors, officers and employees, had the authority to suspend or terminate an investment option. Effective January 1, 2002, the Fund Committee or its delegates have the authority to suspend or terminate an investment option.  All other defendants named herein had a duty to take whatever actions necessary to protect the Plan and its participants, including, but not limited to, disregarding

-14-

Plan documents and/or directives as they pertain to the investment of Plan assets in Solutia Stock when such investment would be imprudent or harm the Plan participants.

55.    The Plan initially included the Monsanto Stock Fund, which invested in the common stock of Monsanto Company, as an investment option. However, after the establishment of the Plan, no new investments were made in the Monsanto Stock Fund, with any dividends from Monsanto Company stock invested in Solutia Stock.

56.    The Plan also included the Pharmacia Stock Fund, which invested in the common stock of Pharmacia Corporation, as an investment option. However, the amounts in that fund reflected amounts contributed to the Monsanto Plan prior to the spin-off that were invested in Monsanto Company common stock but which were not converted to Solutia Stock. The subsequent merger between Monsanto Company and Pharmacia Corporation resulted in Monsanto Company stock being converted to Pharmacia stock. No new investments were made into the Pharmacia Stock Fund, and any dividends from the fund were invested in Solutia Stock.

57.    One of the investment options selected by the Plan fiduciaries for participant contributions was the Corporation Stock Fund, also known as the Solutia Stock Fund. The Solutia Stock Fund "invests primarily in Solutia common stock and may hold relatively small amounts of cash."

58.    Contributions to the Solutia Stock Fund were held in different accounts depending on the source of the contributions.

59.    Contributions made by Plan participants were held in the Solutia Stock Fund / Employee Stock Account ("Employee Stock Account").

-15-

60.    Contributions made by the Company pursuant to their matching obligations were invested in the Solutia Stock Fund / Company Match Account (the "Company Match Account"). The Plan restricted the trading or selling of Solutia stock provided as the Company match except under limited circumstances. For example, but for the last two days prior to Solutia's bankruptcy, only participants who were 100% vested in the Plan could transfer amounts in their Company Match Account out of Solutia Stock Fund and into alternative investments.

61.    Solutia matched 60% of each participant's contributions, up to 8% of the participant's eligible pay, with Solutia Stock. (Prior to 1999, the Company match was limited to 7% of the participant's eligible pay.)

62.    The Employee Stock Account was offered as a retirement investment option under the Plan until December 15, 2003, when by amendment to the Plan signed and authorized by Defendant Bevington, as Chair of the Plan Committee, no new investments could be made in Solutia Stock. Up until December 15, 2004, all matching contributions were made in the form of Solutia Stock. Accordingly, participants had their retirement money forced into Solutia Stock until just two days before Solutia's bankruptcy filing.

63.    Following December 15, 2003, the Plan's investment options were amended such that: (i) a participant could no longer transfer amounts into the Employee Stock Fund; and, (ii) a participant could transfer amounts out of the Company Match Account into other investment options regardless of vesting.

64.    As a result of the Plan's offering Solutia Stock as an investment option during the Class Period, all participants in the Plan, and the Plan itself, suffered losses as a result of the

-16-

imprudence of that investment option and the lack of disclosures from the Plan's fiduciaries regarding its prudence.

65.    As a result of the Company's matching all participant contributions with Solutia Stock during the Class Period, all participants in the Plan, and the Plan itself, held shares of Solutia Stock during the Class Period.

**2.    Vesting**

66.    Participants are immediately 100% vested in their voluntary contributions plus actual earnings thereon.

67.    Participants who were hired on or after January 1, 1999, become 100% vested in Solutia matching contributions after completing three years of service.

68.    Participants who were hired before January 1, 1999, and were employed with Solutia for less than three years, became vested in Solutia matching contributions based on the following schedule:

| Amount of Employment | Vesting Percentage |
|---|---|
| Less than 1 year | 0% |
| 1 year | 20% |
| 2 years | 40% |
| 3 years | 100% |

69.    Participants automatically become 100% vested in Solutia matching contributions regardless of length of service upon: (i) reaching age 65; (ii) becoming totally and permanently disabled; or (iii) death of the employee.

70.     Forfeited amounts of non-vested Company matches (i.e., the Company Match Account) are used to reduce future Solutia matching contributions or administrative expenses of the Plan. However, if a participant is re-employed by the Company or a subsidiary before the participant incurs five consecutive one-year breaks in service, the forfeited amounts are restored to the participant's Company Match Account and any additional service will be added to the previous service toward the three year requirement.

### 3.     The ESOP

71.     As part of the Plan, Solutia also had an Employee Stock Ownership Plan (the "ESOP"), which constitutes an "ESOP" within the meaning of ERISA 407(d)(6), 29 U.S.C. §1107(d)(6), in that it is "an individual account plan ... which is designed to invest primarily in qualifying employer securities."

72.     ESOPs, such as the one involved here, are attractive to publicly traded companies like Solutia for a variety of reasons. An ESOP cuts the cost of raising capital because the company is able to take a federal income tax deduction for principal payments on the loan as well as interest. Dividends are also tax deductible on ESOP stock when they are passed through to participants as they were in the Solutia Plan.

73.     According to Department of Labor ("DOL") rules concerning ESOPs, employees who turn 55 and have had ten years of service with their employer must be allowed to diversify up to 25% of their holdings. When employees with ten years of service turn 60 years old, they must be allowed to diversify up to 50% of their holdings. These diversification requirements can be satisfied by distributing the stock or allowing transfer to another plan.

74.     The ESOP component of the Plan, which was created at the time of the spin-off, was leveraged through a loan.  At the time of the Plan's creation, the Trustee was authorized to borrow money, guaranteed by the Company, for the purpose of acquiring Company shares or repaying a prior loan made for similar purposes (an "ESOP Loan").  Solutia Stock that was acquired by means of the ESOP Loan (the "ESOP Shares") were initially held by the Trustee in a separate ESOP Suspense Account.  As the ESOP Loan was repaid, Solutia Stock was released from the ESOP Suspense Account into the Company Match Account.

75.     As part of the spin-off and consistent with the Plan's assuming many aspects of the Monsanto Plan, a portion of the loans made on behalf of the Monsanto Plan ESOP were transferred to the Plan and became a liability of the Plan.

76.     The ESOP loans to Solutia were repaid some time prior to April 2002.  During 2002 and 2003, fiduciaries of the ESOP purchased or caused to be purchased a total of $22 million in Solutia Stock on the open market to fund the Company match.

77.     The ESOP was not eliminated, and participants were not permitted to transfer amounts out of the Company Match Accounts into other investment options until December 15, 2003, just two days before Solutia's Chapter 11 filing.

**B.     Substantial Losses to the Plan From Investment In Solutia Stock**

78.     By year end 1997, the Plan held roughly 12.77 million shares of Solutia Stock.  At that time, and until the present, the Company had between roughly 114 million and 104 million shares of stock outstanding.

79.     By year end 1998, the Plan held roughly 14.89 million shares of Solutia Stock.

80.     By year end 1999, the Plan held roughly 14.36 million shares of Solutia Stock.

81.    By year end 2000, the Plan held roughly 12.72 million shares of Solutia Stock.

82.    By year end 2001, the Plan held roughly 10.67 million shares of Solutia Stock.

83.    By year end 2002, the Plan held roughly 11.59 million shares of Solutia Stock.

84.    By year end 2003, the Plan held roughly 17.74 million shares of Solutia Stock.

85.    At no point in the Plan's history did the Plan hold as much Solutia Stock as when the Company was bankrupt.

86.    The result of maintaining such a large concentrated investment in a single security was that it effectively precluded the Plan fiduciaries from liquidating the imprudent holding in a timely fashion without causing a collapse in its price. To prevent such a collapse, the imprudent concentrated holding of Solutia Stock would have had to be sold over an extended period of time. None of the risks associated with the Plan's extreme concentration of Solutia Stock were disclosed to Plan participants.

87.    After 2001 until the end of the Class Period, the Plan fiduciaries' took affirmative steps that increased the concentration of Solutia Stock in the Plan. Beginning in 2002, as the extent of Solutia's financial problems began to be publicly disclosed and the stock began its downward spiral, Plan fiduciaries invested ever more Plan assets into Solutia Stock. The risk of this increasing concentration was not disclosed to plan participants.

88.    As a consequence of the Plan's large concentrated holdings of Solutia Stock and the stock's continued decline in price during the Class Period, the Plan's investments in Solutia Stock appreciated/depreciated by the following amounts, as reflected in the SIP's Forms 11-K:

| Year ended Dec. 31 | Gain/(Loss) |
| --- | --- |

| 1997  | $ | 39,000[3]      |
|-------|---|----------------|
| 1998  |   | (62,525,000)   |
| 1999  |   | (97,133,000)   |
| 2000  |   | (45,020,000)   |
| 2001  |   | 24,394,000     |
| 2002  |   | (112,522,000)  |
| 2003  |   | (34,691,000)   |
| 2004  |   | Not Available  |
| **TOTAL** | $ | **(327,458,000)** |

## V. FIDUCIARY STATUS

### A.    Fiduciary Status under ERISA

89.    ERISA requires every Plan to provide for one or more "named fiduciaries," who will have "authority to control and manage the operation and administration of the Plan." ERISA §402(a)(1), 29 U.S.C. §1102(a)(1).

90.    ERISA treats as a fiduciary not only a person explicitly named as a fiduciary under ERISA §402(a)(1), but also any other person who in fact acts as a fiduciary, performs fiduciary functions, or holds fiduciary authority. ERISA makes a person (including a juridical person such as the Company) a fiduciary

> to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such Plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such Plan.

ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

---

[3]    This is based on completed sales only.  The unrealized gain or loss on the Plan's investments in Solutia Stock does not appear to be reported in the 11-K for this period.

91.     Appointing and removing fiduciaries is itself a fiduciary function and persons having this power of appointment and removal are *de facto* fiduciaries.

92.     Employers and their directors and officers may be found to have acted in a *de facto* fiduciary capacity under ERISA if they mislead employees about the character and prospects of the company for the purpose of affecting the employees' ERISA Plan elections.

**B.     Fiduciary Status of Defendants and Solutia**

93.     Defendants were Plan fiduciaries during the Class Period because they were so named and/or because they exercised discretionary authority or control respecting management of the Plan or management or disposition of the Plan's assets or had discretionary authority or responsibility in the administration of the Plan.

94.     Solutia is a fiduciary in that it appoints the members of the Plan Committee and on information and belief exercises discretionary authority over the management of the Plan and the Plan assets.

95.     The Plan Committee (and it members) are named fiduciaries of the Plan who exercised discretionary authority in the administration of the Plan during the Class Period.

96.     The Fund Committee (and it members) are named fiduciaries of the Plan and managed the Plan's assets during the Class Period.

97.     The Plan Defendants are named fiduciaries of the Plan and each served as Plan Administrator at certain times during the Class Period.

98.     The Director Defendants are fiduciaries in that they appoint the members of the Plan Committee, appoint the members of the Fund Committee and on information and belief exercise discretionary authority over the management of the Plan and the Plan assets.

99.    Defendant Northern Trust is a fiduciary because it was the Trustee of the Plan within the meaning of ERISA §403(a), 29 U.S.C. §1103(a), served as an investment manager for the Plan, exercised discretion and authority over the Plan's assets, and accepted directions to purchase and hold Solutia Stock when it knew or should have known that such investment was no longer a prudent retirement investment.

## VI. THE RISE AND FALL OF SOLUTIA

A.    **The Creation of Solutia[4]**

1.    **Introduction**

100.    In 1997, Monsanto Company spun-off its chemicals business as Solutia Inc. pursuant to an agreement between Solutia and Monsanto Company, dated September 1, 1997 (the "Distribution Agreement"). Monsanto Company retained its life sciences business ("Life Sciences") as opposed to its chemicals business.[5]

101.    Old Monsanto spun-off its chemical business only after depriving it of necessary cash for several years prior. Old Monsanto determined that the most effective method to insulate its

---

[4]    These allegations are based, in part, on those in the Complaint and Objection to Claim, dated March 7, 2005, filed by the Official Committee of Equity Security Holders of Solutia, Inc. on its own behalf and on behalf of Solutia, against Monsanto Company and Pharmacia Corporation (collectively referred to herein as "Old Monsanto"). *See In re Solutia Inc., et al.*, No. 03-B-17949 (PCB) (S.D.N.Y.).

[5]    After the 1997 spin-off of the chemical business, the Life Sciences business retained the Monsanto Company name. In 2000 Monsanto Company split up what had been the Life Sciences division by spinning off its agricultural products division as Monsanto Ag (now known as Monsanto Company and referred to herein as "New Monsanto"). Thus, what was historically the Life Sciences business of Monsanto Company is now part of Old Monsanto and New Monsanto. The use of the name "Old Monsanto" herein refers to Pharmacia Corporation as well as the Monsanto Company and its management prior to and after the spin-off of Solutia until the spin-off and formation of New Monsanto.

-23-

growing Life Sciences business from significant environmental and other liabilities associated with its chemical business was to create a new corporate entity (*i.e.*, Solutia) in which Old Monsanto could transfer its enormous debt and legacy liabilities.

102.    Old Monsanto thus structured a spin-off of Solutia by allocating to Solutia an excessive share of liabilities, leaving Solutia with little hope of surviving.

## 2.    Historical Background

103.    Old Monsanto was founded in 1901 as a chemicals manufacturer and eventually grew into a highly successful global enterprise. It expanded its core industrial chemicals business to include the Life Sciences businesses involving pharmaceuticals, food ingredients, and agricultural products.

104.    During the 1970s, 80s and 90s, Old Monsanto owned and operated a number of industrial chemical manufacturing businesses. A number of these operations were discontinued by Old Monsanto. These discontinued Old Monsanto businesses included the manufacture of infamous chemical substances at Anniston (Alabama), Krummrich/Sauget (Illinois) and Nitro (West Virginia).

105.    From an environmental impact perspective, these plants manufactured some of the most notorious substances ever produced in the United States. For example, until 1973, Old Monsanto's Anniston plant was the largest PCB manufacturing facility in the United States. Old Monsanto's Nitro plant manufactured herbicides containing dioxin which was a component of Agent Orange. Old Monsanto's plant at Krummrich/Sauget produced both PCB's and Agent Orange along with other hazardous substances such as DDT.

106.    While the manufacture of these infamous chemicals was the source of significant profits for Old Monsanto, those profits were artificially inflated because of Old Monsanto's ability to defer and thereby avoid the cost of environmental controls and clean-up.

107.    Old Monsanto's manufacture of these infamous chemicals occurred largely prior to the enactment of relevant state and federal environmental laws in the 1970s and 80s. Following the closing of the infamous chemical operations, Old Monsanto delayed implementing costly environmental controls and clean-up in connection with these infamous chemicals as it diverted capital dollars to Life Sciences.

108.    Because of Old Monsanto's failure to employ timely responsible environmental controls, the manufacture of these notorious chemicals created a significant environmental liability legacy that had become obvious to Old Monsanto during the 1990s and became a driving force behind the creation of Solutia. For instance, at Anniston, there was significant PCB contamination that had migrated off-site, impacting sediments in waterways down gradient from the plant and nearby residents. At Nitro, there was apparent widespread dioxin contamination on-site and in the adjacent Kanawha River (which is part of the Ohio River watershed). At Krummrich/Sauget, significant groundwater issues had developed associated with Old Monsanto's historic operations, including problematic landfill operations adjacent to the Mississippi River. Other historic Old Monsanto sites were and are also plagued with significant contamination issues.

109.    The active operations of Old Monsanto's chemical business that were transferred to Solutia had become heavily regulated from an environmental perspective. In addition to the active operations that Old Monsanto transferred to Solutia, Old Monsanto also assigned to Solutia the