environmental liability for several hundred historical sites that Old Monsanto had either used in the manufacture of hazardous chemicals or used as waste disposal sites.

110.    Solutia has never operated these sites and had no connection to them other than the forced assignments of their liabilities.

111.    Beginning as early as 1995, Old Monsanto began considering potential methods of insulating Life Sciences from the company's legacy liabilities.  Old Monsanto, with the assistance of its financial advisers, evaluated several possibilities for disposal of its chemicals business including: (i) merging with another business, (ii) selling the chemicals business, and (iii) spinning-off the chemicals business into a separate entity.  Critical to Old Monsanto's plans was the desire to insulate Life Sciences from the legacy liabilities of the historical "chemicals" company which Old Monsanto knew could be significant in the future.

112.    Several companies initially expressed interest in a potential transaction with Old Monsanto relating to its chemicals business.  However, the potential purchasers' due diligence efforts revealed serious concerns regarding whether a purchaser would be required to assume the potentially significant legacy liabilities of the company and, if so, what price adjustment would need to be made for assumption of those liabilities.

113.    Because none of the interested purchasers would assume the legacy liabilities associated with the company without a severe discount – as much as a billion dollars – to the purchase price, Old Monsanto concluded that the most effective method for accomplishing its goals of improving its Life Sciences' balance sheet and maximizing Old Monsanto's management's compensation was to effectuate a tax-free spin-off of the chemicals business.

3.    **Old Monsanto Resolves To Spin-Off Solutia**

-26-

114.    A spin-off of Solutia had the distinct advantage that no independent third party would evaluate the liabilities or balance sheet of the new entity. In other words, in a spin-off, Old Monsanto only had to deal with itself rather than a third party and could do what it alone wished with the liabilities. Public purchasers of the new company's stock would not be in the same position as a potential purchaser conducting due diligence, but would be forced to rely upon Old Monsanto's public disclosures in order to assess potential liabilities. As a result, Old Monsanto was able to assign significantly more liabilities to Solutia than it would have been able to do in a sale transaction where an independent third party would insist that any acquisition price be adjusted to account for the enormous environmental and related tort liabilities or insist that such liabilities not be assumed in the first place.

115.    For example, Old Monsanto required Solutia to assume $1.03 billion of debt for which Life Sciences had received the benefit of the use of the money. No third-party buyer would have willingly assumed a billion dollars of debt knowing that the seller had spent the billion dollars on the part of the company not being sold.

116.    Moreover, the tax-free nature of the spin-off preserved significant value for Old Monsanto that might otherwise have been lost through substantial tax liability in a different form of transaction. Of course, it was Solutia that bore the risk that if, for any reason, the I.R.S. were to later determine that the structure of the transaction required Old Monsanto to assume a tax liability for the spin-off, Solutia would be required to indemnify Old Monsanto for any such tax liability. This allowed Old Monsanto to guarantee that the spin-off would be tax-free, and also meant that, due to the Federal tax laws, anyone seeking to purchase Solutia within two years of the spin-off would have to assume that contingent tax liability to Old Monsanto. Effectively, Solutia was prevented from

exploring potential strategic options that might have been associated with a sale of its business for at least two years following the spin-off.

117.    Old Monsanto recognized that, unlike a sale of Solutia or its continued operation, a spin-off would afford it an opportunity to insulate Life Sciences from the significant risks associated with the historical chemicals business, whose profits had allowed Old Monsanto to create and develop Life Sciences and eliminate more than a billion dollars of Life Sciences' debt.  Old Monsanto believed that this cleansing of the Life Sciences' balance sheet (at the expense of the future shareholders of Solutia) would position Life Sciences to be sold to a pharmaceuticals company for a potentially significant profit.  Old Monsanto saw that shedding these liabilities could lead to twice the gain: *first*, the gain to Old Monsanto's equity value from the spin-off itself; and *second*, the exponential gain to the value of Old Monsanto's shares if Life Sciences were sold or acquired after the spin-off by a larger life sciences company.  On information and belief, this second, and ultimately extremely lucrative, transaction was only possible with the improvement to Old Monsanto's balance sheet as a result of its dumping of the capital starved Solutia, which it saddled with billions of dollars of Old Monsanto's existing and contingent liabilities at the spin-off.

118.    Additionally, Old Monsanto recognized that there could be significant benefit to its equity value if Old Monsanto could disassociate itself from the Solutia business and be viewed by the market purely as a life sciences company. Life sciences companies that would be in Old Monsanto's post-spin-off peer group generally obtained lofty price-to-earnings ("P/E") multiples. According to Old Monsanto's financial advisors, from 1996 through 1997, the public markets traded life sciences companies within P/E multiples of 21-27 times, whereas the specialty chemicals business were only trading with P/E multiples of 13-17.

119.    Old Monsanto's scheme achieved the desired results. The value of Old Monsanto's stock increased after the spin-off. Then, as designed, management was handsomely rewarded only a few years after the spin-off by a merger of Life Sciences with Pharmacia & Upjohn, Inc. ("Pharmacia") that netted them substantial additional profits.

120.    Old Monsanto's CEO, Robert Shapiro (who orchestrated and oversaw the scheme), realized more than $94 million in the value of just his stock options from the time of the announcement of the spin-off through the merger with Pharmacia in 2000. In 1997, the year of the spin-off, alone, Shapiro realized a gain of more than $46 million on his stock options. Shapiro likely would not have realized such value on his options (as well as more than $18 million in other bonus/incentive-based compensation) without spinning off billions of dollars in debt, environmental liabilities and retiree liabilities to the capital starved Solutia.

**4.    Old Monsanto Burdens Solutia At Time of Spin-Off**

121.    Once Old Monsanto determined that its Life Sciences would be able to retain the most value and best cleanse its balance sheet through a spin-off of Solutia, Old Monsanto began the process of allocating the assets and liabilities of the companies.

122.    In order to achieve but conceal its true goals, Old Monsanto designed the spin-off on the false but deceptively reasonable rationale that it was simply assigning "chemicals" related assets and liabilities to the spun-off Solutia entity. However, the tenuous connection between many of the historical chemicals produced by Old Monsanto that have led to the largest potential spin-off liabilities to Solutia is no greater than their connection to Life Sciences, as both businesses evolved from the same historic company. Life Sciences' business was built on the back of Old Monsanto's historical chemicals business.

-29-

123.    Despite the stated rationale, Old Monsanto still kept for itself the most profitable "chemicals" business such as Roundup® herbicide and also transferred into joint ventures for Old Monsanto's benefit those "chemicals" most critical to its Life Sciences operations such as elemental phosphorus (a key Roundup® ingredient), rather than assigning those assets to Solutia.

124.    In the spin-off, among other things, Old Monsanto imposed on Solutia:

    a.    $1.03 billion of Old Monsanto debt, the proceeds of which did not go to fund Solutia's operations, but instead was spent to support Old Monsanto's Life Sciences;

    b.    *Any* environmental liabilities (including toxic tort claims) purportedly connected to the "historical" chemicals business, including liability for several plants that had been shut-down or sold prior to the spin-off, where, on information and belief, much or all of the proceeds of such sales had gone to Life Sciences, as well as liabilities that solely were related to Old Monsanto's agricultural business. Indeed from 1997 through 2003, more than $1.5 billion dollars has been spent on Solutia's environmental liability related expenses; and

    c.    *Any* "historical" chemicals employee liabilities. This division resulted in a chemicals business that received only 27% of Old Monsanto's EBITDA (earnings before interest taxes depreciation and amortization) while assuming 71% of all of the retired employee-healthcare related liabilities of Old Monsanto.

125.    Additionally, Old Monsanto required Solutia to provide it with a broad indemnity for chemicals liabilities as provided for by section 4.03(b) of the Distribution Agreement.

    a.    **Forced Debt Obligations**

126.    Old Monsanto went so far as to allocate $1.03 billion of funded debt to Solutia (while Old Monsanto kept the cash) even though Old Monsanto knew and had projected significant cash flow shortages for Solutia in 1998 through 2000.

127.    Prior to the spin-off, Solutia's then future management raised significant questions regarding Solutia's ability to service such a large amount of debt and urged Old Monsanto to reduce the amount to nothing greater than $750 million. Old Monsanto refused.

128.    Old Monsanto stuck to the $1.03 billion number despite those concerns and the forecasts that revealed to Old Monsanto that Solutia would have significant cash flow shortages in the future.

129.    Old Monsanto may have had an ulterior motive in refusing to decrease the debt forced on Solutia. At the same time that Old Monsanto forced Solutia to take on $1.03 billion of Old Monsanto's liability that Solutia would repay for Old Monsanto, Old Monsanto purchased Holden's Foundation Seeds, Corn States International and Corn States Hybrid Services (the "Seed Business") for an aggregate price of $1.02 billion.

130.    Old Monsanto announced its decision to purchase the Seed Business in January of 1997, shortly after announcing its decision in December of 1996 to conduct the spin-off. In fact, Old Monsanto actually closed the Seed Business purchase on September 4, 1997, only three days after the spin-off.

131.    By contemporaneously purchasing the Seed Business for $1.02 billion and moving a $1.03 billion liability from its Life Sciences' balance sheet to Solutia's balance sheet, Old Monsanto managed to acquire this significant new business line for its life sciences and remaining agriculture business, effectively for free. Additionally, with this new business and significantly cleaner balance sheet, Old Monsanto knew it would be (and in fact was) a more attractive acquisition prospect.

-31-

132.    While imposing on Solutia an onerous billion dollar debt burden – for which it would see no benefit – Old Monsanto contributed a mere $75 million in cash to Solutia at the time of the spin-off. Old Monsanto had originally intended the amount to be only $50 million, but added the additional $25 million after Solutia demonstrated that it was being forced by its Life Sciences business to assume potential liability for more than $133 million of cash items (the "Cash Items") in connection with the spin-off. Of course, with almost each of these Cash Items, Life Sciences had enjoyed the benefit of the cash or services for which Solutia would now be required to pay.

133.    For example, Solutia suggested that its assumption of the ESOP debt of $30 million to $52 million should be included as part of the $1 billion in debt that Solutia was being required to assume. Solutia pointed out that the original concept was that the total debt to be assigned to Solutia was $1 billion so that the assumption of any additional obligations such as the ESOP debt should be counted towards the $1 billion and reduce the amount of commercial paper debt that Solutia would be required to assume. Additionally, Solutia pointed out that the credit rating agencies had not been provided with cash flow models that contemplated the additional debt. However, since Solutia effectively had no real choice but to accept the structure that Old Monsanto designed for the spin-off, Old Monsanto insisted that Solutia assume such obligations even if that changed the original agreement concerning the debt to be assigned at the inception of the spin-off.

134.    As a further example, Solutia also raised the issue of which entity should be responsible for the approximately $25 million to $35 million of customer rebates that would be due after the spin-off but related to pre-spin-off purchases for which Old Monsanto would have received the cash. Solutia pointed out that Life Sciences had received the benefit of the cash from the sale of those products and so should have responsibility for the payment of the rebate. Moreover, as these

expenses were going to be cash items in 1997 and 1998, Solutia pointed out that Old Monsanto's

retention of that liability would help improve Solutia's cash flow in 1997 and 1998. Old Monsanto

responded that regardless of where the cash ended up, the rebates related to Solutia customers and

were Solutia's responsibility.

### b.     Forced Retiree Liabilities

135.    Solutia was required to provide benefits to approximately 20,000 Old Monsanto

retirees, their dependents and surviving spouses. The majority of these retirees were employees who

retired from Old Monsanto before the spin-off and therefore never worked for Solutia.

136.    Old Monsanto forced Solutia to assume the qualified pension liabilities for

approximately two-thirds of Old Monsanto's previously retired employees with an accrued pension

obligation for such retirees in excess of $905 million while only assigning Solutia one-third of its

operating assets.

137.    Further, Old Monsanto had vested its pre-spin retirees with lifetime, unreduced, cost-

free medical, prescription and life insurance benefits under various iterations of its welfare benefit

plans beginning in 1964. At the spin-off, Old Monsanto imposed liabilities on Solutia in excess of

$575 million for pre-spin retirees at the benefit levels maintained by Old Monsanto at that time.

138.    Under ERISA, as interpreted by the Supreme Court prior to the date of the spin-off,

Solutia, as a new corporation, owed no fiduciary duty to the Old Monsanto retirees or to Solutia's

prospective retirees who would participate in Solutia's employee welfare benefit plan. Moreover,

Solutia had made no promises to Old Monsanto's retirees or to Solutia's prospective retirees who

would participate in Solutia's employee welfare benefit plans.

-33-

139.    Accordingly, Solutia was free to adopt retiree welfare benefit plans providing medical, prescription and life insurance benefits that, even if they provided identical benefits to those provided by Old Monsanto on the date of spin-off, reserved to Solutia the right to amend, modify or even terminate the plans.

140.    Rather than create new retiree welfare benefit plans, Old Monsanto forced Solutia to adopt the Solutia Inc. Medical Benefits Plan for Salaried and Non-Union Hourly Retirees (1997) (the "1997 Non-Union Retiree Plan").

141.    The 1997 Non-Union Retiree Plan in fact adopted and amended Old Monsanto's retiree welfare benefit plans providing medical, prescription and life insurance benefits such that references to "Monsanto Company" were replaced with references to "Solutia Inc." or "Solutia."

142.    Further, Old Monsanto forced Solutia to enter into an Amendment to Employee Benefits Agreements with the unions representing certain of the Old Monsanto employees assigned to Solutia whereby Solutia adopted all of the welfare plans covered by the Employee and Retiree Benefits Agreements (collectively, the "1997 Union Retiree Plans"). The amendment modified the 1997 Union Retiree Plans such that references to "Monsanto Company" were replaced with references to "Solutia Inc." or "Solutia."

143.    By forcing Solutia to adopt Old Monsanto's employee welfare benefit plans, Old Monsanto forced Solutia to assume the liability for Old Monsanto's promises of vested, lifetime, unreduced, cost free retiree medical, prescription and life insurance benefits to the participants of those plans.

-34-

### c.    Forced Environmental Liabilities

144.    Old Monsanto insisted that Solutia assume all of the environmental liabilities (including toxic tort claims) purportedly related to the facilities assigned to Solutia despite the fact that the Anniston, Krummrich and Nitro facilities transferred to Solutia were tainted by Old Monsanto's former operations that detracted from the value of the assets.  These environmental liabilities, if fully disclosed, had the potential of overwhelming any value assigned to these three plants.

145.    While Old Monsanto advertised that agricultural liabilities would be retained by its continuing agricultural business, the most significant environmental legacy issues associated with Old Monsanto's agricultural operations related to dioxin contamination caused by herbicide manufacturing at the Nitro plant.  Old Monsanto's rationale for forcing these dioxin liabilities on to Solutia rather than retaining them with its agricultural business was that Nitro had on-going operations (unrelated to the herbicide/dioxin production) that were being transferred to Solutia.  Not only did the environmental remediation at Nitro have nothing to do with the interests transferred to Solutia, the environmental liability costs associated with the dioxin clean-up will likely dwarf any value associated with the business at Nitro that was being assigned to Solutia.

### d.    Forced Operating Agreements

146.    Old Monsanto required Solutia to assume a number of below-market, long-term, operating and service agreements (the "Operating Agreements") that Old Monsanto had entered into with third parties (the "Counterparties") before the spin-off.

147.    The Operating Agreements generally provide that Solutia operate certain facilities for the Counterparties. Unlike other similar agreements in the industry, many of the Operating

-35-

Agreements are priced such that Solutia receives no profit for providing the services required by the Operating Agreements.

148.    Many of these Operating Agreements were negotiated and entered into with Old Monsanto in connection with a sale of the respective facility to the Counterparty. Thus, Old Monsanto structured the transactions so that it received the "profit" from the Operating Agreements up front from the sale price, rather than through the services to be provided pursuant to the long-term Operating Agreements. Of course, at the time of the spin-off, Old Monsanto kept the cash from these sales and used the bulk of such monies to support Life Sciences. Solutia was left with the burdens of the Operating Agreements.

149.    Following the spin-off, Old Monsanto continued to extract value from these Operating Agreements at Solutia's expense. In many of the Operating Agreements, Solutia pays the costs and expenses of operations and is then reimbursed by the Counterparty for such costs. As part of the original negotiations, Old Monsanto required many of the Counterparties to provide a cash deposit to secure the Counterparties' obligations to reimburse Old Monsanto should the Counterparty not reimburse an expense.

150.    Old Monsanto kept the cash deposits of the Counterparties but forced Solutia to assume the $40-$50 million obligation to the Counterparties for the return of those funds. Thus, Solutia has been required to carry that liability on its books even though those funds offered Solutia no security or protection should the Counterparties default in their obligations, because the cash deposits stayed with Old Monsanto.

   **e.**  **Forced Tax Indemnities**

151.    Old Monsanto required Solutia to provide a tax indemnity that not only limited Solutia's activities going forward, but indemnified Old Monsanto if the tax treatment of the spin-off changed for any reason. Similar to its desire to use the spin-off to ensure a no-cost acquisition of the Seed Business, Old Monsanto required the indemnity so that it was assured that it would always reap the value of a tax free spin-off even if the IRS later determined that the structure of the transaction did not support a tax-free treatment. Old Monsanto required this indemnity, knowing and acknowledging that if Solutia was forced to make the resultant indemnity payment, Solutia would not be able to remain in business.

152.    Old Monsanto also required Solutia to provide an ongoing indemnity to Old Monsanto for all contingent, known and unknown liabilities relating to Solutia and any and all losses of Old Monsanto relating to Solutia's failure to discharge such liabilities. This blank check provided Old Monsanto with a back-stop guarantee for any claims that could arise in the future, further insulating Old Monsanto from any responsibility for the liabilities related to Solutia. Moreover, this structure enabled Old Monsanto to place itself in a structurally superior position to Solutia's public equity holders in the event of a bankruptcy or liquidation of Solutia.

**5.    Old Monsanto Concealed Solutia's Under-Capitalization**

153.    Solutia was undercapitalized at its inception based on the liabilities Old Monsanto forced it to assume with the limited assets that it was given.

154.    However, Old Monsanto realized that it was necessary for it to appear that Solutia was not being created as an undercapitalized company into which Old Monsanto had transferred environmental, retiree and other liabilities for which Old Monsanto would have been responsible. This was especially important so that Old Monsanto could convince the credit rating agencies to

-37-

assign Solutia an investment grade credit rating for its public debt. With this investment grade credit rating in hand, Old Monsanto would be able to dump its newly received Solutia shares on an unsuspecting investing public and provide Solutia with access to capital markets that would enable Old Monsanto to further distance itself from Solutia.

155.    Old Monsanto's desire to maximize the amount of liabilities to be foisted upon Solutia with the desire for securing an investment grade rating for its debt would require Old Monsanto to manipulate the assumptions in their forecasts and, in particular, the future costs of the environmental liabilities.

### a.    Legacy Environmental Liabilities Never Disclosed

156.    In structuring the spin-off, Old Monsanto understood that significant residual contamination existed due to its failure to invest in environmental controls at the time it manufactured various infamous chemicals and other hazardous chemicals. Old Monsanto also understood that while the particular regulatory outcome was uncertain, there were tremendous potential liabilities (including private tort claims) associated with this residual contamination. It was exactly this tremendous potential liability that Old Monsanto sought to avoid in designing and structuring the spin-off.

157.    Since regulatory agencies have discretion in setting cleanup requirements, the ultimate magnitude of these chemicals' related liabilities was, and continues to be, subject to some uncertainty. However, because of the public and regulatory stigma associated with PCB's and dioxin, Old Monsanto knew in 1997 that certain events were likely to occur which would cause the environmental liabilities associated with Old Monsanto's discontinued businesses (which Old Monsanto was cramming into Solutia) to jump into the $1 billion range.

-38-

158.    There were a number of events that Old Monsanto's management recognized could cause Old Monsanto's environmental liabilities to dramatically escalate, such as:

a.    A significant judgment or settlement associated with pending third party PCB related claims at Anniston;

b.    Dredging of off-site PCB's at Anniston;

c.    Onerous groundwater treatment requirements at Sauget;

d.    Dioxin dredging in the Kanawha River; and,

e.    An aggressive Natural Resource Damage award associated with off-site PCB's at Anniston;

While it was not certain that any of these events would come to fruition, Old Monsanto knew that each of these events posed very real risks which, if realized, would have an extraordinary negative economic impact on the company responsible for the liabilities.

159.    At the time of the spin-off, Old Monsanto's management was desperately searching for a vehicle through which it could shed these significant economic exposures. The most obvious mechanism for escaping the risks was to force them on Solutia, notwithstanding the fact that the infamous chemicals giving rise to the risks had absolutely no connection with businesses that were transferred to Solutia and that the contamination occurred many years prior to the spin-off.

160.    Old Monsanto's ability to shed these environmental liabilities was complicated by the fact that the true risks associated with Old Monsanto's historical production of the infamous chemicals had never been disclosed to its shareholders/investors, particularly the risks that certain events, if they occurred, could push environmental liabilities into the billions. Coming clean with the investors at the time of the spin-off by disclosing the truth about Old Monsanto's environmental liabilities would have jeopardized Old Monsanto's ability to successfully transfer these significant

-39-

risks to Solutia. As a result, Old Monsanto chose not to make such full and clear disclosures in its offering statements or other public disclosures.

161.    The total mix of information Old Monsanto provided to the public in connection with the spin-off and the sale of Solutia stock was incomplete and misleading. The disclosures made in connection with the spin-off to unsuspecting equity holders were inconsistent with the environmental challenges that Old Monsanto knew that it faced.

162.    Old Monsanto's forecasts, and even its reserves, were designed to ignore the identified and foreseeable exposure to the major environmental and retiree liabilities that ultimately precipitated Solutia's chapter 11 filing. Old Monsanto's reserves for the environmental liabilities imposed upon Solutia apparently were not intended to address known environmental risks except where such liabilities were probable and quantifiable. Old Monsanto's management acknowledged in private meetings, however, that the reserves for the spun-off company did not cover any exposure to "major" environmental liabilities. Neither that specific acknowledgment nor the risk of "major" environmental liability was ever disclosed in any proxy statement or offering memorandum.

163.    In the final spin-off, Old Monsanto effectively dumped all of these legacy environmental risks into Solutia without properly disclosing the true nature of the risks to prospective equity investors in the public markets. In particular, section 2.03 of the Distribution Agreement provides for the parties to take all action necessary to cause Solutia to assume all of Old Monsanto's liabilities. These terms are unreasonably favorable to Old Monsanto because they force Solutia to assume, among other things, environmental and tort liabilities caused by environmental contamination and tortious conduct in which it had no part. Further, Solutia did not have a meaningful choice as to whether or not to accept the liabilities.

-40-

### b.    Old Monsanto Improperly Obtains Good Credit Rating

164.    Old Monsanto did everything in its power to achieve an investment grade credit rating for Solutia, even if that meant using unrealistic projections and assumptions. Old Monsanto knew that certain financial statements/projections were not reasonable or realistic, nor were they likely to be achieved in the future based on the debt-to-capital ratio that it intended to impose on Solutia.

165.    For example, Old Monsanto recognized that by shifting cash flow assumptions, it could create forecasts that would support the required investment grade rating. Indeed, when discussing and evaluating various issues, Old Monsanto made clear that the issues could not be resolved until it knew what the targets were and could "plug in the numbers to hit the target."

166.    Additionally, Old Monsanto discussed including certain numbers from historical divested and discontinued businesses in its Solutia financials for 1994-1996 in order to establish a more favorable trend in gross profit on a going forward basis.

167.    Old Monsanto ran baseline projections in mid-1997 that showed that with $1 billion of debt, Solutia would not have enough cash to cover its cash obligations as early as 1998 and would be cash-flow negative within the first year of the spin-off.

168.    Nevertheless, Old Monsanto did everything it could to sugar-coat the projections given to the credit-rating agencies in order to secure the investment-grade credit rating for Solutia. Old Monsanto did so despite having their own internal projections that showed a decidedly less rosy picture for Solutia's future. For example, when Old Monsanto realized that Solutia would quickly run out of cash with the debt burden that Old Monsanto would impose on Solutia in the spin-off, Old Monsanto worked on new projections and assumptions to provide to the credit-rating agencies and others that would conceal the potential cash-flow crisis. Even though the projections showing the

-41-

cash crisis were prepared just a few months prior to the meetings with the credit rating agencies, on information and belief, the credit rating agencies never saw projections that considered the possibility of a negative free cash flow for Solutia, especially not as early as 1998. Old Monsanto omitted this potential cash-crisis from any of its more public disclosures and instead used the overly optimistic projections without regard for the known risk of Solutia running out of cash within a year after the spin-off.

169.    The false optimism of Old Monsanto's bullish projections for Solutia was quickly borne-out by Solutia's actual financial results. Old Monsanto's EBITDA projection for Solutia for 1997 exceeded the actual by more than $120 million despite Old Monsanto's making that projection a quarter of the way through the year. Old Monsanto's EBITDA projection for Solutia was inflated by more than $88 million for the next year, 1998, and by more than $288 million for 1999.

170.    In the following years, the gap widened even further between Old Monsanto's projected EBITDA for Solutia as given to the rating agencies and Solutia's actual financial results. This increasing gap is no surprise, as the overly optimistic and unreasonable projections given to the credit rating agencies could not keep up with a business that was spun-off with onerous legacy and other liabilities and had been capital starved by Old Monsanto prior to the spin-off. In fact, it makes perfect sense that Old Monsanto's deprivation of the capital necessary for Solutia's long-term future would have an amplified impact on Solutia's results as time went on and Solutia fell further behind its competitors in its plants and operations.

171.    Old Monsanto knew or should have known that the capitalization of Solutia would be insufficient to support a chemicals business such as Solutia's in light of the enormous debt placed on the Company and the ongoing legacy liabilities it was forced to assume. Old Monsanto attempted

-42-

to resolve the cash flow shortage by manipulating the business model for Solutia, but ultimately nothing was actually done by Old Monsanto to provide Solutia with adequate cash or assets to succeed on a long term basis.

172.    Additionally, the forecasts created and relied upon by Old Monsanto to model Solutia's business following the spin-off did not appropriately account for Solutia's assumption of the environmental and retiree liabilities on top of the $1 billion in debt that was unilaterally assigned to Solutia.

173.    The few downside scenarios that Old Monsanto considered did not fully or properly account for the environmental and other liabilities that Old Monsanto knew or should have known were reasonably predictable. These analyses presumed that Solutia would need to cut its capital expenditures significantly in order to survive on a long term basis. However, Old Monsanto's financial advisors made it clear at the outset that a critical part of Solutia's long term value and growth of its business depended on significant capital expenditures and investment opportunities.

174.    This was especially true in light of the capital deprivation that the assets assigned to Solutia suffered prior to the spin-off.  Old Monsanto knew or should have known that the lack of necessary capital would hamper Solutia's ability to develop new products it would need to compete in the chemicals industry, as well as limit its ability to improve its production process as necessary to lower its costs of delivering its goods into the market.

175.    The onerous retiree and environmental liabilities that Old Monsanto forced Solutia to assume were much higher than the industry average on a percentage basis and hindered Solutia's competitive abilities, especially in light of the many years of inadequate capital investment in Solutia.

176. Old Monsanto knew or should have known that putting Solutia in a position where it could only survive by cutting these necessary capital expenses would severely hinder Solutia's already weak competitive position and ultimately doom Solutia.

**6. Old Monsanto Management Designed the Spin-Off to Benefit Themselves**

177. The Old Monsanto executives who structured and controlled the execution of the spin-off had no serious interest in the ultimate success or failure of Solutia. Their compensation was tied to Old Monsanto's financial performance and they used the spin-off as an opportunity to enrich themselves and Old Monsanto. Enriching management was a paramount goal, even at the expense of under-capitalizing Solutia and concealing the full extent of the legacy liabilities and potential for Solutia's future failure from the credit rating agencies and public markets.

178. Indeed, in just a few months after the spin-off, Old Monsanto's stock was up more than 7%.

179. As an example of the amounts at stake from the increasing value of the Old Monsanto stock resulting from the spin-off, Old Monsanto's CEO, Robert Shapiro, realized more than $46 million on his stock options in 1997 (the year of the spin-off) bringing his overall compensation for 1997 to more than $50 million. This was a dramatic increase over the $5 to $7 million that Old Monsanto's CEOs had made in the years prior to the spin-off.

180. More importantly, Old Monsanto knew that the cleansing of its balance sheet – at the expense of the newly spun, undercapitalized Solutia – made Life Sciences a more attractive acquisition target. Indeed, in 2000, Old Monsanto realized its ultimate goal: Pharmacia merged Life Sciences and Old Monsanto's management profited again. For example, Mr. Shapiro realized more than $20 million in the value of his stock options in 2000, and his total compensation that year was

-44-

more than $34 million. Indeed, from the year of the spin-off through the merger with Pharmacia, Shapiro made more than $94 million from just his Old Monsanto stock options and more than $119 million in overall compensation. From 1993 through 1996, Old Monsanto's CEOs had made a combined compensation amount of only $21 million.

181.    Management could not have realized these personal profits if Old Monsanto had not spun-off Solutia with the onerous debt and legacy liabilities that doomed Solutia to failure. By structuring the spin-off in the way that they did, Old Monsanto managed to enhance substantially its stock price and the value of management's incentive compensation and stock options, many of which would not have vested but for the spinning off of Solutia.

182.    Old Monsanto's scheme becomes even more apparent by noting the timing of Old Monsanto's changes to its senior management compensation structure that created the possibility for management to realize tremendous value. These compensation incentives were put into effect in 1996, just prior to Old Monsanto publicly moving forward with the Solutia spin-off plan.

### 7.    Old Monsanto Continued to Burden Solutia Even After the Spin-Off

183.    Old Monsanto and Solutia began disagreeing about the meaning and intent of certain provisions of the Distribution Agreement shortly after the spin-off.  These disagreements revolved around costs and expenses incurred in connection with the spin-off that Solutia expected Old Monsanto to pay.  Instead, Old Monsanto insisted that Solutia was responsible for them.

184.    Even after the spin-off, Old Monsanto, through the pressure of the indemnity and its multitude of relationships with Solutia, coerced Solutia to enter into additional agreements to Old Monsanto's advantage and Solutia's detriment.

185.    Old Monsanto became involved in a litigation that was occurring between Solutia and the retirees of Old Monsanto when Solutia attempted to eliminate and change certain of the benefits that were being provided to the retirees that it was forced to assume. This litigation ultimately resulted in a settlement whereby Solutia retained and confirmed liabilities to the retirees that until that point, it was not required to retain, and Old Monsanto was effectively released from further liability.

186.    In 1998, Solutia terminated the 1997 Non-Union Retiree Plan and the 1997 Union Retiree Plan effective January 1, 2000 and adopted the Solutia Inc. Medical Benefits Plan for Retirees (2000) (the "2000 Retiree Plan").

187.    The 2000 Retiree Plan for the first time would have required its participants to contribute to the premium cost of providing retiree medical benefits.

188.    Solutia subsequently filed a lawsuit entitled *Solutia Inc. v. George Forsberg, et al.*, No. 3:98cv237/RV, in the United States District Court for the Northern District of Florida, Pensacola Division against the participants of the 1997 Non-Union and Union Retiree Plans seeking a declaration that Solutia was free to terminate those plans and replace them with the 2000 Retiree Plan.

189.    On or about September 4, 1998, several Old Monsanto retirees filed a class action lawsuit entitled *Baird v. Monsanto Company*, Case No. 3:99cv168/RV, against Old Monsanto and Solutia in the United States District Court for the Eastern District of Missouri alleging breach of contract, breach of fiduciary duty and violations of the Labor Management Relations Act ("LMRA"). The plaintiffs sought to enforce the promises Old Monsanto made to them to provide vested retiree medical benefits.

-46-

190.    On or about April 27, 1999, Old Monsanto successfully moved to consolidate the Baird lawsuit with the Solutia declaratory judgment action pending before the United States District Court for the Northern District of Florida.

191.    In the consolidated lawsuit, both Old Monsanto and Solutia were represented by the same law firm, which had been a longtime legal advisor to Old Monsanto.

192.    This litigation ultimately resulted in a settlement pursuant to which Solutia adopted the Solutia Inc. Medical Benefits Plan for Retirees (2002) (the "2002 Retiree Plan") effective January 1, 2002.

193.    The 2002 Retiree Plan requires Solutia, at tremendous cost, to maintain for unionized retirees who retired prior to December 1994 and for non-unionized employees who retired prior to June 25, 1992, lifetime medical benefits at a certain level and subject to a cap on the amount participants can be required to contribute for coverage and for later retirees, the identical medical benefits through December 31, 2006.

194.    In contrast, the settlement agreement absolved Old Monsanto from having either to provide any retiree medical benefits or contribute any of the cost of providing such benefits to anyone in the class of retirees involved in the lawsuit, unless Solutia first became insolvent and ceased to provide benefits under the 2002 Retiree Plan.

195.    The settlement agreement absolved Old Monsanto of its obligations, despite the fact that under ERISA Old Monsanto was required to provide vested benefits to some or all of the class plaintiffs or was otherwise estopped from refusing to provide such benefits to them.

196.    Thus, once again, Old Monsanto had managed to eliminate its own liabilities and force them on Solutia while ending Solutia's chance to legally eliminate those liabilities.

-47-

8.    **New Monsanto Seeks Indemnity from Solutia**

197.    When Old Monsanto decided to separate its agriculture business into New Monsanto, Old Monsanto and New Monsanto required Solutia to enter into an amendment of the Distribution Agreement (the "Amendment") to provide New Monsanto with the same broad indemnity for chemicals liabilities that Solutia had given Old Monsanto. Pursuant to section two (2) of the Amendment, the indemnity provided for in Article IV of the Distribution Agreement would now run in favor of both Old Monsanto and New Monsanto. Solutia did not have a meaningful choice as to whether or not to enter into the Amendment, nor as to whether to accept the terms of section two (2).

198.    New Monsanto provided no consideration to Solutia for the granting of the New Monsanto Indemnity. Even though it received no consideration from New Monsanto for entering into the Amendment, Solutia did so, thus obligating it not only to Old Monsanto, but to New Monsanto as well.

199.    As New Monsanto was itself a spin-off from Old Monsanto, New Monsanto knew or should have known that because of the significant liabilities Solutia was required to assume, Solutia had been undercapitalized at the time of its spin-off. Nonetheless, New Monsanto required that Solutia protect it from these same significant liabilities that rendered Solutia undercapitalized.

200.    New Monsanto also knew or should have known that the material risks posed to Solutia by these significant liabilities, especially in light of the capital deprivation prior to the Solutia spin-off, had never been adequately disclosed to the public shareholders of Solutia.

B.    **Solutia Inflates Earnings with Antitrust Violations**

201.    As part of the spin-off, Solutia assumed control of (and liability for) some of Old Monsanto's former businesses. One such business for which Solutia became responsible was

Flexsys L.P., a 50/50 joint venture with Akzo Nobel that Solutia described as the world's leading supplier of process chemicals to the rubber industry.[6] Solutia knew that the value of this partnership was suspect: two years earlier, Flexsys had entered into an agreement with two other prominent rubber chemicals suppliers, Bayer/Rhein Chemie[7]; and Crompton/Uniroyal[8], to maintain their market position and quash competition by setting prices in the industry.

202.    During the Class Period, Flexsys faced the prospect of declining returns in the rubber chemicals industry. New market entrants threatened to take market share away from Flexsys, Bayer and Crompton while demand remained stable. Thus while it was critical for Flexsys to retain its volume to continue to meet its public projections, it grappled with competition for its market share.

203.    At the very time that smaller market entrants were threatening Flexsys' market share, Solutia faced its own problems, *e.g.*, the daunting prospect of paying for costly environmental clean-ups incurred by Old Monsanto. With no promise of meeting its projections through legitimate means, and the real danger that newcomers might gain toeholds in the market, Solutia ratified and benefitted from Flexsys' agreement to artificially set rubber chemicals prices with Crompton and Bayer.

---

[6]    Flexsys was created in 1995 when Akzo Nobel, based in Arnhem, Netherlands, and Old Monsanto merged their respective rubber chemical businesses in a 50-50 joint ownership venture. Once Solutia was spun-off from Old Monsanto in 1997, Solutia owned the half of Flexsys formerly owned by Old Monsanto.

[7]    Rhein Chemie Rheinau GmbH is a wholly owned subsidiary of Bayer AG. The Rhein Chemie group is a Bayer Group company that operates as an independent unit within Bayer Polymers. These entities are referred to herein as "Bayer."

[8]    Uniroyal Chemical is a wholly owned subsidiary of Crompton Corporation. These entities are referred to herein as "Crompton."

204.    Solutia's first CEO, Defendant Potter, was privy to the problems with Flexsys' pricing. Potter had previously served as Chief Executive of Old Monsanto's Chemical Division, which oversaw Flexsys until it was passed on to Solutia in the spin-off. The companies also shared a core of managers since several managers from Old Monsanto's rubber chemicals segment transferred to either Solutia or Flexsys in the wake of the spin-off and maintained close working relationships between the two companies.

205.    In addition, Flexsys was governed by a Supervisory Board, half of which was staffed by Solutia personnel. These personnel reported to Solutia executives who had the authority to make decisions about Solutia's finances and operations, including Defendants Hunter, Clausen and Potter. Further, James Sullivan, who was, at various times, Solutia's Vice President and Controller, its Principal Accounting Officer, and its Chief Financial Officer, monitored Flexsys through its Supervisory Board and oversaw various parts of Flexsys' audits.

206.    Solutia relied on the price-fixing agreement to preserve an image of financial health. Flexsys provided from 20 to 25 percent of Solutia's operating earnings from 1997 until approximately October 2002. In 2002, Solutia was able to complete a $200 million note offering based in part on Flexsys' apparent market dominance.

207.    Solutia needed to maintain this appearance because the Company was laboring under the litigation defense costs Solutia assumed in the spin-off.

208.    On September 26, 2002, European Union ("EU") authorities, as part of a probe into price fixing in the rubber chemicals market, raided the European subsidiaries of the three companies that dominate the rubber chemicals market, Flexsys, Bayer and Crompton.

209.    In the wake of that investigation, Crompton admitted that it met with Flexsys and Bayer and agreed to set and maintain prices in the rubber chemicals industry.  In its plea before the Commissioner of Competition and attorney general of Canada, Crompton stated that: "The conspiracy affecting certain rubber chemicals lasted from at least July, 1995 to 2001. The participants in this conspiracy included Crompton, Bayer, Flexsys and Duslo." Flexsys, Crompton and Bayer "agreed to coordinate the timing and amounts of price increases for certain rubber chemicals . . . and to allocate customers and sales volumes.  They also exchanged sales data and customer information on a periodic basis in order to monitor and enforce adherence to the agreement." Crompton will pay a $9 million (Canadian) fine, out of a maximum potential liability of $10 million (Canadian).

210.    Both Crompton and Bayer have pled guilty in one of four ongoing grand jury investigations conducted by the DOJ in the Northern District Court of California.  Crompton will pay a $50 million fine while Bayer will pay $66 million.

211.    Because Flexsys is the leading rubber chemical manufacturer in the world, it is inconceivable that Bayer and Crompton could have engaged in such long-term price fixing schemes without Flexsys' involvement.

212.    In fact, after the close of business on October 10, 2002, Solutia announced that it was the target of an investigation by the U.S. Department of Justice ("DOJ"), the European Commission and Canadian authorities.  That investigation is ongoing. *See* Solutia Form 10-K for year end 2004, at 12.

213.    On or around February 18, 2005, Flexsys agreed to settle private charges against it involving its role in the antitrust violations. *See In Re Rubber Chemicals Antitrust Litigation*, No. M:04-cv-01648-MJJ (N.D. Cal.).

## C.    Solutia's Descent into Bankruptcy

214.    As detailed above, when Solutia was spun-off from Old Monsanto in 1997, Solutia was contractually obligated under the Distribution Agreement with Old Monsanto to bear the responsibility for over a billion dollars of legacy liabilities that accrued to Old Monsanto for over a century of manufacturing. Under the terms of the Agreement, "*Solutia [was] required to manage the litigation and indemnify Monsanto for costs, expenses and judgments arising from the litigation.*" *See* Form 10-K for fiscal year ended December 31, 1997 (emphasis added).

215.    Although Solutia stated in its Form 10-K for the fiscal year ending December 31, 1997 that, "Solutia does not believe these [litigation] matters or their ultimate disposition will have a material adverse effect on Solutia's consolidated financial position, profitability or liquidity in any one year," the Company knew that the inherited litigation would be extensive and costly.  In the same 1997 Form 10-K, Solutia acknowledged that questions concerning a Superfund site in Texas had spawned more than a half-dozen cases, and incurred charges of over $10 million while the discharge of polychlorinated biphenyls ("PCBs") from Old Monsanto's Anniston, Alabama site had sparked class actions joined by thousands of plaintiffs.

216.    Throughout the Class Period, these obligations grew increasingly burdensome and gravely undermined Solutia's ability to operate as a going concern.

217.    Solutia revealed the extent of its obligations only gradually. For example, in Solutia's Form 10-K for the year ending December 31, 1999, Solutia mentioned for the first time that Old

Monsanto was previously named as a defendant in a Pennsylvania case. Solutia also disclosed that in fiscal year 1999, it had agreed to settle one of the Alabama cases for $23 million and a guarantee of $18 million in remediation over six years. In anticipation of settling two more Alabama lawsuits, Solutia recorded an additional charge of $29 million.

218.    In February 2001 one financial analyst listed Solutia among his candidates of stocks to short, noting its "debt amounts to 56 times shareholders' equity." John Dorfman, *Newsday*, Feb. 10, 2001, at F12.

219.    Litigation costs continued to climb in fiscal year 2000. In the Company's Form 10-K for the fiscal year ended December 31, 2000, filed March 8, 2001, the Company revealed that a jury had returned a $90 million verdict (reduced to $45 million by the trial court) in a Pennsylvania PCB case.

220.    In that same document, Solutia acknowledged the likely impact of its growing liabilities. The Company stated:

> Resolution of those Anniston, Alabama cases may have a ***material adverse effect*** on Solutia's net income in a given year, although it is impossible at this time to estimate the range or amount of any such liability.

(emphasis added.)

221.    Aside from indemnification costs, the Company's financial health continued to deteriorate. For fiscal year 2000, Solutia reported a $15 million loss, which grew to $36 million by the end of fiscal year 2001.

222.    On January 1, 2002, the *Washington Post* ran a front-page story detailing how Old Monsanto knew early on about the toxic and likely carcinogenic and mutagenic effects of PCBs, but

for years concealed this information from the public, as well as concealed the extent of the PCB contamination in Anniston.

223.    Solutia had of course inherited liability for the Anniston PCB contamination from Old Monsanto, so when stocks opened for trading the following day, January 2, 2002, Solutia stock fell 10% from its December 31, 2001 price of $14.02, to close at $12.54. It plummeted another 28% on January 3, 2002 – down all the way to a close of $9 per share.[9]

224.    It was at this point, January 2, 2002, that a prudent fiduciary relying only upon publicly available information would have determined that Solutia Stock, and the Solutia Stock Fund, was an imprudent investment and an imprudent investment option for the Plan and its participants. For the reasons detailed above, Solutia Stock was an imprudent investment from its inception. But it was not until January 2, 2002, that sufficient information had been disclosed to the public about Solutia's undercapitalization, chronic financial problems, and overwhelming legacy liabilities that it became, or should have become, clear even to those without access to material inside information that investment in Solutia Stock was speculative.

225.    Around this time, Moody's Investor Services ("Moody's") downgraded Solutia's debt ratings. On February 4, 2002, for example, Moody's downgraded the rating of Solutia's senior unsecured debt from Baa3 to Ba1. This represented a downgrade to a category of obligations that Moody's considers to have "speculative elements" and a "future [that] cannot be considered as well assured."

-------

[9]     On this day, January 3, 2002, Solutia responded to the *Washington Post* article with a press release. Among other things, Solutia stated that facts contained in the *Washington Post* article were "one-sided" and "biased." The investing public disagreed, and the share price of Solutia stock never returned above its January 2, 2002, price.

226. On July 12, 2002, Moody's further lowered the rating on Solutia's senior unsecured debt from Ba3 to B3. This downgrade indicated that the securities were "speculative," were "subject to high credit risk," and "lack[ed the] characteristics of a desirable investment."

227. At the same time that Solutia faced skyrocketing losses and expanding litigation costs, its apparently profitable rubber chemicals division came under antitrust scrutiny. When the Company was forced to admit to the public on October 10, 2002, that multiple authorities were investigating Flexsys for collusion and price-fixing in the rubber chemicals industry, Solutia's stock price subsequently dropped roughly 8% to $4.86 per share on the news, and over 81% from its Class Period high of $26.31 per share.

228. Deprived of Flexsys' apparently stable earnings, the financial toll of Old Monsanto's legacy liabilities further weakened the Company.

229. The $38 million gain, which Solutia reported in 2002, evaporated in 2003 with a reported loss of $372 million.

230. In the Company's Form 10-Q for the quarterly period ended June 30, 2003, filed August 14, 2003, the Company admitted that verdicts in certain of the Anniston, Alabama cases were "*far in excess of amounts the Company had accrued* as of June 30, 2003" and that related cases using those verdicts as a basis of valuation "would result in a valuation in excess of *$3 billion*" (emphasis added). The company acknowledged that any appeal in those cases would take years, and predicted that:

> Without a dramatic change in circumstances, the *continuing overhang of the PCB litigation and other legacy liabilities will significantly restrict the Company's alternatives* to address both short term and long term liquidity requirements with respect to the refinancing of the credit facility, bond maturities and projected contributions to its pension plans.

(emphasis added).

231.   On August 8, 2003 Moody's further lowered the rating on Solutia's senior unsecured debt from B1 to Caa3.  This final downgrade represented Moody's conclusion that the Company's bonds were of "poor standing," just slightly above "highly speculative."  The bonds were deemed by Moody's to be "subject to very high credit risk" and near default.

232.   In the Company's Form 10-Q for the quarterly period ended September 30, 2003, filed November 14, 2003, Solutia disclosed that it would have to take action to reduce its current level of legacy liabilities, which by then were costing Solutia approximately $100 million a year. Once again, the Company reviewed its dire financial condition and then emphasized how it had labored under the causes of its demise since its very inception:

> *Due to the prolonged economic slow down, coupled with the prevalence of energy and raw material cost above historic levels, the financial burden of servicing these liabilities has become relatively more significant to the Company.* These legacy liabilities consist primarily of the following:
>
> Retiree healthcare, life insurance costs and disability benefits: Since the spin-off, Solutia has been required to provide retiree healthcare and life insurance benefits to retirees who retired from Pharmacia prior to the spin-off and who never worked for Solutia, as well as disability benefits to individuals who became disabled while working for Pharmacia prior to the spin-off. *Currently Solutia provides retiree and disability benefits to approximately 20,000 pre-spin[-off] retirees and disabled individuals,* their dependents and surviving spouses, roughly five times the number of Solutia retirees, dependents and surviving spouses.
>
> Environmental compliance and remediation costs: *Since the spin-off, Solutia has been required to bear the costs of environmental remediation and associated compliance obligations relating to Pharmacia's historic chemical business* under applicable federal, state and local environmental laws. *In virtually all instances these obligations arise from activities conducted by Pharmacia prior to the spin-off* and fall into two broad categories: (a) obligations related to properties that are not currently owned by Solutia, and (b) obligations related to properties currently owned by Solutia, including clean-up obligations for off-site migration of contaminants. *The vast majority of remediation actions taken to date at properties owned by Solutia*

-56-

*relate to contamination that emanated from the properties prior to Solutia's ownership.*

Litigation defense costs and judgments: Since the spin-off, Solutia has been responsible for bearing the cost associated with various toxic tort lawsuits related to polychlorinated biphenyls ("PCBs"), premises based asbestos and other chemical exposures from the conduct of the historic chemical business of Pharmacia. *Currently Solutia is defending approximately 570 asbestos actions (involving an estimated 3,500 to 4,500 plaintiffs) brought against Pharmacia.* In addition, notwithstanding the recent settlement of cases relating to the Anniston plant site, *Solutia is still defending approximately 30 cases involving alleged exposure from PCB's manufactured by Pharmacia prior to the spin-off.* Solutia also is currently defending approximately 90 general and product liability claims which have been brought against Pharmacia.

(emphasis added).

233.    The Company admitted that its ongoing legacy liabilities compelled it to "consider [ ] all available alternatives to address these matters, including, but not limited to, a potential *reorganization under Chapter 11* of the U.S. bankruptcy code" (emphasis added). Solutia 10-Q, filed November 14, 2003.

234.    Roughly one month later, Solutia declared bankruptcy on December 17, 2003.

235.    In a press release issued that same day, the Company placed the blame for its bankruptcy on the legacy liabilities inherited from Old Monsanto:

"Solutia has spent approximately $100 million each year to service legacy liabilities that it was required to accept at the time of the spin-off from Monsanto," said John C. Hunter, chairman, president and chief executive officer of Solutia. "We have taken aggressive steps to offset these legacy costs and strengthen our financial health by cutting more than $100 million from our operating costs, working with Monsanto Corporation to resolve the onerous Alabama PCB litigation, refinancing our credit facility and beginning to restructure our broader debt portfolio. Concurrently, we have made every effort to come to an out-of-court resolution with Monsanto regarding these legacy liabilities. However, these negotiations have not been successful.