**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
JEREMY DICKERSON,                               :
                                                :
                        Plaintiff,              :    Case No. 04-CV-07935 (LAP)
                                                :
v.                                              :
                                                :
SHEILA FELDMAN, et al.                          :
                                                :
                        Defendants.             :
------------------------------------------------------------x


------------------------------------------------------------x
ROGER REIFF,                                    :
                                                :
                        Plaintiff,              :    Case No. 07-CV-06011 (LAP)
                                                :
v.                                              :
                                                :
FRANK A METZ, JR., et al.                       :
                                                :
                        Defendants.             :
------------------------------------------------------------x
```

## JOINT DECLARATION OF CLASS COUNSEL

Pursuant to 28 U.S.C. § 1746, we declare as follows:

1.      I, Ronen Sarraf, am a member of Sarraf Gentile LLP ("SG"), co-counsel for plaintiffs in the above referenced actions.

2.      I, Ellen M. Doyle, am a member of Stember Feinstein Doyle & Payne, LLC ("SFD&P"), co-counsel for plaintiffs in the above referenced actions.

3.      SG and SFD&P are collectively referred to herein as "Class Counsel."

4.      Except as otherwise noted with regard to each firm's time and expenses, we jointly declare as follows:

## I.    INTRODUCTION

5.    We respectfully submit this Joint Declaration in support of final approval of the parties' Global Settlement Agreement, dated May 20, 2008 (the "Settlement Agreement").[1] The Settlement Agreement resolves all claims alleged by Plaintiffs in: (1) *Dickerson v. Feldman, et al.*, No. 04-cv-7935 (SDNY) ("Dickerson Action"); (2) *Dickerson v. Feldman, et al.*, No. 06-1616-cv (2d Cir.) ("Dickerson Appeal"); (3) *Reiff v. Metz, et al.*, No. 07-cv-06011 (SDNY) ("Reiff Action"); and, (4) *In re Solutia Inc., et al.*, No. 03-17949 (SDNY Bnkr.) ("Bankruptcy Proceeding").

6.    We submit this Joint Declaration to assist the Court in determining the fairness, reasonableness, and adequacy of the settlement of these actions on the terms and conditions reflected in the Settlement Agreement.  We also submit this Joint Declaration in support of Class Counsel's accompanying application for an award of attorneys' fees, reimbursement of expenses, and case contribution awards to Jeremy Dickerson and Roger Reiff.

7.    Attached to this Joint Declaration are true and correct copies of the following:

Exhibit A:    Global Settlement Agreement, dated May 20, 2008.

Exhibit B:    Time Entries and Summaries for SG.

Exhibit C:    Time Entries and Summaries for SFD&P.

Exhibit D:    Time Entries and Summaries for Malakoff Doyle & Finberg, P.C. ("MDF").[2]

Exhibit E:    Case Expenses for SG.

---

[1]    All capitalized terms not defined herein shall have the same meaning ascribed to them in the Settlement Agreement.  This Joint Declaration and the statements contained herein are without prejudice to Plaintiffs' position on the merits in the event that the Settlement is not approved by the Court.

[2]    MDF is the predecessor firm to SFD&P.

Exhibit F:      Case Expenses for SFD&P.

Exhibit G:      Case Expenses for MDF.

Exhibit H:      Resume for SG and its attorneys working on this litigation.

Exhibit I:       Resume for SFD&P and its attorneys working on this litigation.

Exhibit J:       Invoices from Lowenstein Sandler PC.

Exhibit K:      Declaration of Jenny Trang.

Exhibit L:      Statement of Independent Fiduciary.

## II.     CASE SUMMARY

### A.     Background

8.      On December 17, 2003, Solutia Inc. ("Solutia"), the sponsor and administrator of the Solutia Inc. Savings and Investment Plan (the "Plan"), filed for Chapter 11 bankruptcy protection.

9.      In August 2004, several months before the first of these actions was filed, Class Counsel began investigating possible wrongdoing in connection with the Plan.  These investigations included a review of public filings with, among other entities, the Securities and Exchange Commission ("SEC"), the Department of Labor ("DOL"), and various state and federal courts.

10.     Class Counsel's review focused on Solutia's bankruptcy proceedings and the various adversary proceedings that had been filed in connection with it.  Class Counsel reviewed the initial bankruptcy petitions along with the affidavits that had been filed in support of Solutia's bankruptcy application.

11.     In light of Class Counsel's investigation, discussions ensued regarding the possibility of wrongdoing in connection with the Plan's investment of Solutia stock in the

years and months preceding Solutia's bankruptcy. After considerable factual investigation, Class Counsel determined that the Plan's fiduciaries had breached their fiduciary obligations in connection with the administration of the Plan, that such breaches caused losses to the Plan and its participant accounts, and that the Plan's participants had viable claims for recovery on behalf of the Plan.

12. After concluding that colorable claims existed, Class Counsel researched the proper venue and form of judicial intervention necessary in order to prosecute these claims. We determined that it would be in the best interest of the Plan and the Class to file an action in the District Court for this District against the Plan's non-debtor fiduciaries and litigate the same claim against Solutia in its bankruptcy proceedings.

13. Class Counsel began preparing the initial complaint and class proof of claim that would be filed in connection with this litigation. On behalf of Jeremy Dickerson, and pursuant to 29 U.S.C. § 1024, Class Counsel made a written request to the Plan for the production of certain Plan-related documents. The identities and locations of the Plan's fiduciaries (and likely defendants) were researched. A process server was retained to assist in the service of the complaint. A loss analysis was conducted to assist in the formulation of Plan losses to be included in the both the complaint and the proof of claim.

### B.    The Commencement of the Litigation

14. On October 7, 2004, Plaintiff Jeremy Dickerson commenced an action against the Plan's non-debtor fiduciaries. *See Dickerson v. Feldman, et al.*, No. 04-cv-7935 (SDNY) (the "Dickerson Action"). Pursuant to 29 U.S.C. § 1132(h), Class Counsel notified the Department of Labor and the Department of Treasury of the filing.

15. On October 19, 2004, Claimant Jeremy Dickerson filed a proof of claim (the

"Bankruptcy Claim") against Solutia. *See In re Solutia Inc.*, No. 03-17949 (SDNY Bnkr.) (Claim No. 854).

16.    The Dickerson Action and the Bankruptcy Claim were filed on behalf of the Plan and its participants and beneficiaries for whose benefit the Plan held Solutia common stock at any time between September 1, 1997 and December 15, 2003.  The Dickerson Action named as defendants the individual and committee fiduciaries of the Plan (the "Solutia Defendants") and the Plan's trustee, The Northern Trust Company ("Northern Trust").  The Dickerson Action did not name Solutia because it had filed for bankruptcy protection.

17.    The Dickerson Action and the Bankruptcy Claim alleged that the Plan's fiduciaries caused the Plan to invest in Solutia stock and to offer participants the corporation Stock Fund ("Stock Fund") as a retirement investment option.  Dickerson further alleged that, notwithstanding Solutia's overwhelming financial problems, it was not until December 15, 2003, just two days before Solutia's bankruptcy filing, that Plan fiduciaries eliminated the Stock Fund as an investment option and ceased to invest company matching contributions to the Plan in Solutia stock.

### C.    Withdrawing the Bankruptcy Reference

18.    In an effort to coordinate similar litigation necessarily commenced in two different courts, Class Counsel prepared and filed a motion to withdraw the bankruptcy reference with respect to the Bankruptcy Claim and to litigate the claims against Solutia in the District Court.  *See Dickerson v. Solutia*, No. 04-cv-09735 (SDNY).

19.    Class Counsel briefed the motion and on March 11, 2005, presented oral argument.

20.    On March 11, 2005, this Court denied the request but noted that changed

circumstances may warrant the withdrawal of the bankruptcy reference at some point in the future:

> [I]f the facts change and counsel think that they have changed sufficiently that a renewal of the motion to withdraw the reference is appropriate, counsel certainly has permission to do so, but at this point in time, plaintiff's motion to withdraw the reference is denied without prejudice to renew.

*Dickerson v. Solutia, Inc.*, No. 04-cv-9735 (LAP), Transcript of Hearing, dated March 11, 2005, at 11:13 to 11:18.

### D.    The Amended Dickerson Action and Dismissal

21.    Class Counsel amended the complaint in the Dickerson Action.  This amendment involved significant legal and factual research and resulted in a substantially revised and enlarged complaint.  In particular, Class Counsel reviewed the various proceedings in the Bankruptcy Court and the various committees' adversary proceedings.  Class Counsel reviewed public filings, media articles and analyst reports.  In all, Class Counsel produced a ninety page highly particularized amended complaint.

22.    By Order, dated April 25, 2005, the Court directed counsel for Defendants to identify by letter to Class Counsel any deficiencies in the amended complaint which they regarded as fatal to the cognizability of its claims, and allowed Class Counsel one week to amend the complaint (one last time) to address any such deficiency.

23.    By separate letters dated May 13, 2005, counsel for the Solutia Defendants and counsel for Northern Trust identified a number of alleged deficiencies in the amended complaint.  We reviewed the letters from counsel and revised the complaint to address the issues raised in those letters.

24.    On May 20, 2005, we filed a Second Amended Class Action Complaint.  The Defendants moved to dismiss the complaint and filed therewith lengthy memoranda and

numerous exhibits in support thereof.  Defendants' motions to dismiss raised numerous issues,

many of them novel and based on rapidly evolving interpretations of ERISA by numerous

courts and the Department of Labor.

25.    Class Counsel opposed the motions with two separate briefs.

26.    On March 30, 2006, this Court issued an Opinion granting Defendants' motions to

dismiss the Dickerson Action, on the ground that Plaintiff Dickerson lacked standing.

E.    **The Appeal of the Dickerson Action**

27.    On April 3, 2006, Dickerson appealed the dismissal of the Dickerson Action to

the United States Court of Appeals for the Second Circuit.  *See Dickerson v. Feldman, et al.*,

No. 06-1616-cv (2d Cir.) ("Dickerson Appeal").

28.    At the time of the dismissal of the Dickerson Action, no appellate court had ruled

on the issue of whether someone in Dickerson's position had standing to sue for violations of

ERISA and the trial courts were split in their treatment of the issue.  The Dickerson Appeal

was the first instance in which a Circuit Court would review the issue.

29.    In light of the importance of the issue, the briefing on the Dickerson Appeal was

extensive and exhaustive.  Issues of constitutional and statutory standing were raised, as were

the interpretation of ERISA's statutory language and scheme.

30.    The Department of Labor ("DOL") and AARP filed amicus briefs in support of

Dickerson and the National Association of Manufacturers filed an amicus brief in support of

Defendants.

31.    In addition to addressing the arguments raised by Defendants' amicus, we also

had to address the arguments that were raised by Defendants themselves.  This included not

only the issues that had been raised by the Court's dismissal order, but also issues relating to

Supreme Court jurisprudence, DOL interpretative bulletins and various public policy arguments.

32.    During the briefing of the Dickerson Appeal, the Second Circuit issued a decision in *Coan v. Kaufman*, 457 F.3d 1493 (2d Cir. 2006), which altered the analysis for determining statutory standing pursuant to ERISA.  We modified our argument to reflect this new Second Circuit law.

33.    On May 21, 2007, the Second Circuit held oral argument in the Dickerson Appeal.  The DOL participated in the oral arguments.

34.    On December 11, 2007, following intense settlement negotiations which began in the Bankruptcy Court, the parties reached an agreement in principal to settle all the claims alleged in these actions and requested that the Second Circuit stay its decision pending a final resolution of the matter.  On December 21, 2007, the Second Circuit stayed its decision and on June 4, 2008, at the request of the parties, remanded the Dickerson Appeal to this Court for "consideration of the Global Settlement Agreement."

**F.    The Bankruptcy Proceedings**

35.    Concurrent with the filing and prosecution of the Dickerson Action, the Dickerson Appeal and the Reiff Action, Class Counsel continued litigating the Bankruptcy Claim in Solutia's bankruptcy proceedings.  This required not only the monitoring of Solutia's bankruptcy action, but also monitoring the actions in which Solutia was a party and the various adversary proceedings that were commenced following Solutia's bankruptcy filing.

36.    Following and staying abreast of Solutia's bankruptcy proceeding was no easy task, as the volume of litigation and claims alleged were immense.  For example, at the time the Dickerson Action was filed the Chapter 11 bankruptcy docket for Solutia's bankruptcy

action had roughly 1500 entries. As part of the preparation for this litigation, Class Counsel had to review all of these filings. While the docket entries for some filings indicated that they were irrelevant and thus did not warrant further review, others needed to be read, sometimes completely. Similarly, the litigation activity in that single docket was intense: by the time these claims were resolved on a global basis, there were over 4400 entries on the docket.

37. Solutia's bankruptcy filing also spawned numerous other litigation which had to be monitored and reviewed.[3] Some of these proceedings had little activity and relevance to these ERISA claims. Others, however, were directly on-point and were so actively litigated that they required constant monitoring.

38. In total, between the commencement of the Dickerson Action and the resolution of these claims, we: (1) monitored, read, summarized and participated in the creation of nearly 3000 docket entries in Solutia's Chapter 11 proceedings; (2) monitored nearly a hundred bankruptcy adversary proceedings involving Solutia; (3) actively litigated the ERISA claims against Solutia in the Bankruptcy Court; and (4) attended numerous bankruptcy hearings and conferences.

1.    **Amending and Certifying the Bankruptcy Claim**

39. Class Counsel advanced the Bankruptcy Claim at every opportunity. When new

---

[3]    There were roughly 90 adversary proceedings filed in Solutia's bankruptcy proceedings bearing the following case numbers: 03-93700; 04-02364; 04-02374; 04-02969; 04-03057; 05-01202; 05-03260; 05-03261; 05-03262; 05-03263; 05-03264; 05-03265; 05-03266; 05-03267; 05-03268; 05-03269; 05-03270; 05-03271; 05-03272; 05-03273; 05-03274; 05-03275; 05-03276; 05-03277; 05-03285; 05-03286; 05-03287; 05-03288; 05-03289; 05-03290; 05-03291; 05-03292; 05-03293; 05-03294; 05-03295; 05-03296; 05-03297; 05-03298; 05-03299; 05-03300; 05-03301; 05-03302; 05-03303; 05-03304; 05-03305; 05-03306; 05-03307; 05-03308; 05-03309; 05-03312; 05-03313; 05-03314; 05-03315; 05-03316; 05-03317; 05-03318; 05-03319; 05-03320; 05-03321; 05-03322; 05-03323; 05-03324; 05-03325; 05-03326; 05-03327; 05-03328; 05-03329; 05-03330; 05-03332; 05-03333; 05-03334; 05-03335; 05-03336; 05-03337; 05-03338; 05-03339; 05-03341; 05-03342; 05-03343; 05-03344; 05-03345; 05-03347; 05-03348; 05-03349; 05-03350; 05-03351; 05-03352; 05-03353; and, 08-01057.

information became available, we amended and revised the Bankruptcy Claim to include the new information (we ultimately amended two separately filed bankruptcy proofs of claim a total of three times). We moved to certify the claims as class proofs of claim and we fought off efforts to dismiss the claims entirely.

40.    Soon after the filing of the Bankruptcy Claim, Class Counsel prepared and filed an amended proof of claim. This required a review of Solutia's most recent filings with the DOL and the Plan's most recent filing with the SEC.

41.    We also prepared and filed a motion to certify the Bankruptcy Claim as a class proof of claim pursuant to Federal Rule of Civil Procedure 23 and Federal Rules of Bankruptcy Procedure 7023 and 9014.

42.    Solutia and the Official Committee of Unsecured Creditors of Solutia opposed the motion to certify the Bankruptcy Claim and filed opposition papers therewith.

### 2.    Defending the Bankruptcy Claim

43.    In addition to amending and seeking to certify the Bankruptcy Claim, we also had to defend the claim against two separate efforts to expunge it.

44.    Solutia's first effort to expunge the Bankruptcy Claim was on standing grounds, following this Court's May 2005 dismissal order in the Dickerson Action. Class Counsel briefed that motion and filed supplemental authority in connection with it.

45.    Solutia's second effort to expunge the Bankruptcy Claim was on subordination grounds claiming that Plaintiffs' ERISA claims were in fact claims arising from the purchase of a security and thus subordinated to the claims of other unsecured credits pursuant to 11 U.S.C. § 510(b). Solutia's subordination motion presented a serious and possibly fatal challenge to the Bankruptcy Claims and raised complex and novel questions of law.

46.    On July 10, 2007, at a hearing before the Bankruptcy Court Judge Beatty

previewed her assessment of the subordination issue (among other objections raised by Class

Counsel in connection with Solutia's attempted emergence from bankruptcy) and explained to

Class Counsel as follows:

> The one problem that I would like to remind you of is you could talk yourself out
> of this situation pretty easily and talk yourself out of having a good claim very
> easily because it's only when you say it doesn't matter what it was -- the security
> was that the fiduciary bought that gives me the right to the breach of fiduciary
> claim. That you stay away from your 510 subordination problems. Once you say
> that it matters that it was Solutia's stock that was bought you start collapsing in on
> the wording of 510 to the point where it talks about the purchase and sale of
> securities of the debtor.

Transcript of Hearing, dated July 10, 2007, at 49:18 to 50:22.

47.    At a second hearing on July 17, 2007, Judge Beatty reiterated her views to Class

Counsel:

> [I]f the claim is made solely that they shouldn't have bought the debtor's stock,
> then the question really does arise whether, under the language of the Code, it is a
> claim for the purchase or sale of the debtor's securities. In which case, it is, by
> law, subordinated. What I was trying to suggest is that when you assert the claim,
> as one for the purchase or sale of Solutia stock, that is to say that that's what they
> did wrong. They should not have bought Solutia stock. That puts you right into
> the language of the Code.
>
>           . . . .
>
>  . . . . I am not that familiar with ERISA duties but I am familiar with the code and
> I am saying to you that unless you can insert that middle, the breach of fiduciary
> duty[,] your claim[,] is going to disappear into the subordinated category. So that
> you've got this real little niche that you've got to fit into. Okay. I understand that
> similar claims in other cases have been carried as general unsecured claims. I'm
> not sure because I'm not familiar with those cases and they weren't mine. I don't
> think that – I have never seen a situation where someone told me that they wanted
> the subordinated claim where it involved the purchase or sale of the debtor's
> securities by a fiduciary in an ERISA plan, okay. So I have not ever researched
> the law but I am saying to you that -- that the emphasis has to be on the breach of
> fiduciary duty in order to get it into the general unsecured class. Because as soon
> as it's on the -- buying Solutia stock it's in the secured claim class -- the securities
> claim class and that class is simply a reiteration of what the law says, okay. And if

you fit that definition, which is what the law -- how the law defines it, you're in
that definition.

Transcript of Hearing, dated July 17, 2007, at 56:18 to 57:2, 57:12 to 58:6.

48.    Recognizing the complexity of the subordination issue, the nuances involved and

the fatal effect it could have on the amount of money the Class could get from the Solutia estate,

Judge Beatty recommended that Class Counsel retain special bankruptcy counsel:

> I would offer to you the suggestion that if you people aren't bankruptcy
> professionals that if you want to pursue this, and you believe there's any money in
> this, then you need to find some bankruptcy assistance in order to pursue this.
> Because this is a real subtlety.
>
> . . . .
>
> . . . . [T]his area is one where what may look good to you, as non-bankruptcy
> attorneys, may not look so good from a bankruptcy perspective.

Transcript of Hearing, dated July 17, 2007, at 59:18 to 59:24, 62:19 to 62:21.

49.    In light of the Bankruptcy Court's comments, Class Counsel interviewed and

retained Michael S. Etkin, Esq., of Lowenstein Sandler PC, to serve as Plaintiffs' Special

Bankruptcy Counsel.  While we were litigating these claims on a contingency basis and had

not been paid for any of our work thus far, we agreed to pay the hourly rates of Mr. Etkin and

his staff.  Those costs amounted to nearly $200,000, without any assurance that we would be

reimbursed.

50.    With the assistance of Mr. Etkin and his staff, we prepared opposition papers to

Solutia's subordination motion.  Shortly after its filing, settlement discussions began.

### 3.    The Equity Committee Litigation

51.    In addition to Solutia's Chapter 11 proceedings, Class Counsel actively monitored

numerous adversary proceedings within Solutia's bankruptcy that could impact the interests of

the Class.  Of particular importance was the litigation between the Equity Committee and

12

Solutia's predecessors.

52.    In March 2004 the United States Trustee for the Southern District of New York appointed an Equity Committee to represent the interests of Solutia's equity stock holders in Solutia's bankruptcy proceedings.  After a lengthy investigation, the Equity Committee concluded – just as we did – that Solutia had been improperly capitalized from its inception with no hope of survival.  The Equity Committee thereafter filed a complaint against Solutia's predecessors alleging that Solutia's 1997 spin-off was a "fraudulent transfer in that Old Monsanto forced Solutia to take on excessive liabilities and insufficient assets, such that Solutia was destined to fail from its inception."  *See Official Committee of Equity Security Holders v. Pharmacia Corporation and Monsanto Corporation*, No. 05-1202 (SDNY, Bnkr.).

53.    Because of the factual similarities between these ERISA claims (which alleged that Solutia stock was an imprudent retirement investment) and the claims subsequently brought by the Equity Committee (that Solutia was destined to fail from its inception), we had to closely monitor the Equity Committee's prosecution of the claims.

54.    The Equity Committee's litigation was contentious: not only did the defendants file motions to dismiss (which were denied) but Solutia itself later moved to quash the Equity Committee's claims on the ground that it lacked standing to pursue claims that rightfully belonged to Solutia.  After lengthy briefing and oral argument (which Class Counsel attended), the Bankruptcy Court concluded that while the Equity Committee did not have standing to pursue claims which belonged to Solutia, it did have standing to pursue claims on its own behalf.

55.    The claims alleged by the Equity Committee were sufficiently similar to the claims alleged by Plaintiffs, that we had an obligation to closely monitor how those claims

were pleaded, prosecuted and treated by the Court. In all, we spent substantial time ensuring that the Class benefited from the Equity Committee's efforts.

### 4.    Solutia's Disclosure Statement and Plan of Reorganization

56.    Solutia sought to emerge from bankruptcy protection several times, and with each attempt issued a revised disclosure statement and plan of reorganization. Each of those filings – which were each hundreds of pages long – had to be reviewed, analyzed and ultimately critiqued in order to protect the interests of the Class. Guided by the best interest of the Class, we along with the assistance of Special Bankruptcy Counsel, prepared objections and revised curative language for each iteration of Solutia's bankruptcy emergence.

57.    Solutia's first attempt to emerge from bankruptcy protection occurred in early 2006 with the filing of a disclosure statement and plan of reorganization. Class Counsel reviewed the several hundred page filing and noted multiple failings, including the failure to adequately describe how the Bankruptcy Claim would be treated, the effect of the Bankruptcy Claim on the estate, and the availability of insurance to pay for some of the Bankruptcy Claim. In particular, Class Counsel observed the expansive release language and exculpation clause that was included in the reorganization plan, the effect of which would be to release all of Plaintiffs' claims in the District Court and in the Bankruptcy Court without any consideration.

58.    Class Counsel prepared and filed a lengthy objection to the disclosure statement. Eventually, Solutia abandoned this effort to emerge from bankruptcy.

59.    In May of 2007, Solutia filed an amended disclosure statement and plan of reorganization. Once again, we had to review the several hundred page filing. While some prior grievances were addressed numerous were not. In addition, material changes to the first

iteration of the filing, caused additional concerns to be raised.  As before, we prepared and filed an objection to the first amended disclosure statement.

60.    Of note, the May 2007 amended disclosure statement disclosed – for the first time – that the DOL had investigated the Plan's fiduciaries for possible breaches of their ERISA obligations.  According to the disclosure statement, the DOL commenced its investigation sometime in 2005 several months *after* Class Counsel filed the Dickerson Action and a proof of claim in the Bankruptcy Court.[4]  According to the disclosure statement, the DOL concluded that certain fiduciaries breached their duties of monitoring other fiduciaries of the Plan.  The DOL, however, did *not* find that: (1) the Plan had been harmed by these alleged breaches; (2) offering Solutia stock as Plan investment option was itself a violation of ERISA; or, (3) that it caused any Plan participant to suffer an investment loss.  Further, the DOL did not assert any monetary fines or penalties against any Plan fiduciary, nor did it file any action therewith.  (After learning of the DOL's investigation and findings, Class Counsel contacted the DOL and learned from the DOL that it would not pursue any further action against the Plan or any of its fiduciaries).

61.    Solutia's amended disclosure statement faired similarly and Solutia returned to the drafting table.  Of note, during this process, is the fact that other parties to the bankruptcy proceedings also objected to the disclosure statement and plan of reorganization, filings which we reviewed and discussed.

62.    We also attended every hearing held in connection with the possible approval of Solutia's emergence from bankruptcy and orally presented Plaintiffs' objections to Solutia's amended disclosure statement at two hearings held on July 10 and July 17, 2007.

---

[4]      As explained above, Class Counsel promptly notified the DOL (and the Treasury Department) of the filing of the Dickerson Action.

63.    Over the course of the next several months, Solutia presented three more iterations of its proposal to exit bankruptcy.  Each presented different features and had to be separately reviewed.  Eventually, Special Bankruptcy Counsel took up the task of reviewing the filings and negotiating our position with Solutia.

64.    By October 2007, Solutia presented the fifth (and what would be the final) disclosure statement and plan of reorganization.  By this point, negotiations with Solutia's counsel had advanced to the point where we were not only discussing the revisions to the disclosure statement and plan of reorganization regarding the treatment of the Bankruptcy Claim, but we were also discussing a possible settlement of the Bankruptcy Claim.

### 5.    Ongoing Work in the Bankruptcy Court

65.    Class Counsel's efforts in the Bankruptcy Court did not end with the settlement of the Bankruptcy Claim or this Court's withdrawal of the bankruptcy reference.  Those efforts remain ongoing to this day.

66.    Indeed, as Plaintiffs' papers in support of final approval of this Settlement were being prepared – even as this very Joint Declaration was being drafted – Class Counsel continued monitoring the docket in the Bankruptcy Action in order to ensure the orderly and proper settlement of these claims.

67.    For example, on August 25, 2008 (just days before this Joint Declaration was filed) Solutia and Northern Trust presented for the Bankruptcy Court's approval a stipulation resolving certain claims between them, including claims arising out of these actions.  *See* Settlement Agreement (Ex. A), ¶ 14.9 (referencing stipulation between Northern Trust and Solutia).  A hearing on the matter is preliminarily set for September 8, 2008, which Class

Counsel will attend if necessary.[5]

G.    **The Reiff Action**

68.    In June 2007, following the oral argument in connection with the Dickerson Appeal, we were retained by a current employee of Solutia to file a separate action on behalf of the Class in District Court.

69.    On June 25, 2007, Plaintiff Roger Reiff filed claims in the District Court against the Plan's non-debtor fiduciaries. *See Reiff v. Metz, et al.*, No. 07-cv-6011 (SDNY) ("Reiff Action"). Like the Dickerson Action, the Reiff Action was brought as a class action pursuant to ERISA, 29 U.S.C. § 1132, on behalf of the Plan and its participants and beneficiaries for whose benefit the Plan held Solutia Stock at any time between September 1, 1997 and December 15, 2003. Like Dickerson, Reiff named as defendants the Plan's fiduciaries, excepting Solutia. Pursuant to 29 U.S.C. § 1132(h), Class Counsel notified the Department of Labor and the Department of Treasury of the filing.

70.    Defendants moved to dismiss the Reiff Action. Their dismissal papers raised some of the arguments that had been made in the Dickerson Action, as well as a new argument for dismissal on statute of limitations grounds. This new ground for dismissal presented considerable challenges and considerable risk as to the viability of the Reiff Action.

71.    In light of the advanced stage of settlement talks in the Bankruptcy Court, we had hoped to avoid additional motion practice in the District Court. However, because progress in those talks was slow and a global settlement was still not available, we were required to respond to the motions to dismiss.

---

[5]    As with the majority of the bankruptcy hearings in this matter, and in an effort to minimize cost, only one attorney from New York (whose office is near the Bankruptcy Court) attended.

72.    Shortly after we filed our opposition papers, we reached an agreement in principal to resolve all the claims on a global basis, and agreed to stay any further briefing on the motions to dismiss pending final approval of the settlement.

## III.    SUMMARY OF THE SETTLEMENT

### A.    Settlement Negotiations

73.    The parties began settlement negotiations roughly three years after the first of these actions was commenced.  At that time, the parties had fully briefed the Dickerson Appeal and were awaiting decision; Plaintiff Reiff had filed the Reiff Action and the parties had begun briefing Defendants' motion to dismiss; the parties had completed briefing Solutia's motions to dismiss and subordinate the Bankruptcy Claim; and Plaintiffs had resolved most of their objections to Solutia's disclosure statement and plan of reorganization.

74.    The parties first broached settlement in connection with evaluating the effect that the Bankruptcy Claim could have on Solutia's reorganization.  After Solutia moved to subordinate the Bankruptcy Claim, Plaintiffs responded with an exhaustive opposition brief and initiated settlement discussions.  At that time, the parties informed the Bankruptcy Court that settlement discussions were underway and the Court stayed its decision on the pending motions.

75.    The Settlement Agreement followed exhaustive, arms-length negotiations.  They initially involved Class Counsel, with the assistance of Special Bankruptcy Counsel, and counsel to Solutia.  The terms of a settlement with Solutia were reached in late 2007 and finalized on the eve of Solutia's confirmation hearing.  The terms of the settlement were read into the record by Solutia's counsel, John Henes, on November 29, 2007.  That settlement, which was only with respect to Solutia, provided Plaintiffs with, among other things, a

$6,650,000 unsecured claim against Solutia's estate and the right to continue to prosecute the claims against Solutia in District Court but only as against its insurance policy.

76.    Following the finalization of a settlement in principal with Solutia, settlement discussions increased with counsel for the Solutia Defendants.  On December 11, 2007, the parties had reached a settlement in principle and notified the Second Circuit and District Court of their agreement.  The Second Circuit stayed the appeal for 90 days and the District Court suspended any continued briefing on the motions to dismiss.

**B.    Settlement Procedure and Finalization**

77.    Following the parties' agreement in principal to settle all claims involving the Plan on a global basis, the parties began the process of formalizing their agreement.  In light of the fact that the Settlement sought to resolve claims that were currently pending in three separate courts, we first had to devise a procedure by which competent final court approval would be sought.

78.    The parties initially sought to have all the claims referred to the Bankruptcy Court and resolved there.  In light of this, Solutia contacted the Bankruptcy Court with whom the parties had multiple telephonic conferences.  Class Counsel also contacted the Staff Counsel's office for the Second Circuit to discuss the proper procedure to remand the Dickerson Appeal so as to obtain proper final approval of the claims therein.

79.    Following discussions with the Bankruptcy Court and the Staff Counsel's office, the parties focused their attention on a procedure by which final approval of this global settlement could be obtained in the District Court.  Class Counsel began drafting the settlement papers with this procedure in mind.

80.    During this process, we also contacted and spoke with the DOL.  We spoke at

length with Gilardi regarding the notice campaign, the plan of allocation, the liquidation of the

Bankruptcy Claim and the distribution of the Settlement Fund to the Class.  The substance of

all of these communications were incorporated into the settlement papers that Class Counsel

was preparing.

81.    In February 2008 the complex and multi-party process of fashioning a mutual

settlement agreement became more complicated by issues related to the exit financing required

by Solutia to consummate its confirmed plan of reorganization and emerge from bankruptcy.

In particular, several banks which had agreed to provide Solutia with the necessary exit

financing had balked and Solutia had sued them for breaching their agreement.  The timing of

Solutia's emergence as well as the ability to consummate its plan of reorganization and provide

the distributions contemplated thereunder became issues that none of the parties to the

Settlement had previously anticipated.  Class Counsel and Special Bankruptcy Counsel

devoted substantial time monitoring this litigation and discussed at length the ramifications of

the failed financing and its effect on the Settlement.  Fortunately, Solutia resolved the matter.

82.    By April 2008, the Parties had resolved nearly all of the substantive issues of the

settlement agreement and began to address the various items that would comprise the

numerous exhibits to the settlement agreement: notice to the Class; preliminary approval order;

withdrawal of the bankruptcy reference order; escrow agreement; and, final approval order.

83.    On May 20, 2008, the Parties executed the Global Settlement Agreement and we

submitted it to the Court for preliminary approval.

84.    On May 27, 2008, we requested the Second Circuit to remand the Dickerson

Appeal to the District Court for purposes of effectuating the Settlement, which the Second

Circuit granted on June 4, 2008.

85.    The District Court preliminarily approved the Settlement on May 28, 2008, and entered the order on June 5, 2008.

**C.    Settlement Terms**

86.    The Settlement provides for a cash payment of $4,750,000.00 and an allowed unsecured claim of $6,650,000.00 (the "Bankruptcy Allowed Claim") against Solutia's bankruptcy estate.

87.    The cash payment of $4,750,000 is comprised of a single payment of $250,000 from Solutia and a $4,500,000 payment from Solutia's and the Solutia Defendants' insurer. (Solutia also agreed to cover the costs associated with giving notice of the Settlement, including paying an additional $9,500 into the Settlement Fund to cover the cost of mailing the Notice.)

88.    The Bankruptcy Allowed Claim is comprised of shares in the reorganized Solutia (the "New Solutia Shares").  Pursuant to the terms of Solutia's reorganization plan, and based on the per share values assumed therein, all unsecured claims (including the Bankruptcy Allowed Claim) were estimated at roughly 70% of face value.  Because Solutia is now a publicly traded company and the New Solutia Shares trade on the New York Stock Exchange, these shares are subject to market fluctuations and volatility.

89.    The following chart summarizes the total value of the Settlement, including the fluctuating value of the Bankruptcy Allowed Claim:

| Claim Amount ($6,650,000) | | | | Cash Amount | Total Settlement Fund |
|---|---|---|---|---|---|
| Date | Number of Shares | Price Per Share | Claim Value | | |
| POR[6] | N/A | N/A | $4,655,000.00 | $4,750,000.00 | $9,405,000.00 |
| 5/30/08 | 237,913 | $13.77 | $3,276,062.01 | $4,750,000.00 | $8,026,062.21 |
| 6/30/08 | 237,913 | $12.82 | $3,050,044.66 | $4,750,000.00 | $7,800,044.66 |
| 7/30/08 | 237,913 | $15.52 | $3,692,409.76 | $4,750,000.00 | $8,442,409.76 |
| 8/29/08 | 237,913 | $16.80 | $3,996,938.40 | $4,750,000.00 | $8,746,938.40 |

90.    The Settlement Fund, minus any awarded attorneys' fees, expenses, taxes, and case contribution awards, will be allocated to the accounts of the members of the Settlement Class ("Class Members") who had portions of their Plan account invested in the Stock Fund during the Class Period.

91.    The Settlement Class is defined as:  All persons who were participants in the Plan who held Solutia stock in their Plan account at any time during the period from September 1, 1997 through and including August 31, 2005 (the "Class Period") and their beneficiaries, successors, assigns, executors, administrators, estates, heirs and legal representatives. Excluded from the Settlement Class are Defendants and any named fiduciary of the Plan, members of their immediate families, and their legal representatives, heirs, successors, or assigns unless such individual is a member of the Settlement Class in his or her own right.

---

[6]    Based on Solutia's Fifth Amended Plan of Reorganization (as modified), dated November 28, 2007, all unsecured claims (including the Bankruptcy Claim) were estimated at 70% of their value.

### C.    Plan Of Allocation

92.    Under ERISA, breach of fiduciary duty claims like Plaintiffs' are for "plan-wide" relief, and the proceeds are paid into the Plan as an entity.  See ERISA § 409, 29 U.S.C. § 1109.  Ultimately, however, Plan assets must be allocated among the various Plan participants.

93.    The proposed methodology for disbursement of the Settlement Fund ("Plan of Allocation") is similar to allocation methods used in analogous cases.

94.    In relevant part, Plan participants' settlement allocation will be calculated as follows:

95.    For each Class Member, the Claims Administrator will calculate a "Net Loss" using the formula "A + B – C – D," where:

A = the dollar amount in each Class Member's account, if any, held in the Solutia Stock Fund on the first day of the class period (September 1, 1997).

B = the dollar amount, if any, of all transactions involving the Solutia Stock Fund during the class period (September 1, 1997 through and including August 31, 2005) that increased the value of the Solutia Stock Fund in each Class Member's account through purchase, transfer-in, receive, company matching contribution, or the like.

C = the dollar amount, if any, of all transactions involving the Solutia Stock Fund during the class period (September 1, 1997 through and including August 31, 2005) that decreased the value of the Solutia Stock Fund in each Class Member's account through sale, transfer-out, deliver, forfeiture, or the like.

D = the dollar amount in each Class Member's account, if any, held in the Solutia Stock Fund on the last day of the class period (August 31, 2005).

96.    Provided, however, that if "A + B - C – D" is less than zero for a Class Member, such Class Member's Net Loss will be zero.

•    The Class Members' Net Losses will be totaled to yield a loss to the Plan over the Class Period (the "Plan's Loss").

•    For each Class Member, the Claims Administrator will calculate his or her "Fractional Share" of the Plan's Loss by dividing each Class Member's Net Loss

by the Plan's Loss.

•      For each Class Member, the Claims Administrator will calculate his or her "Preliminary Dollar Recovery" by multiplying the Class Member's fractional share by the Net Proceeds.

•      The Claims Administrator will identify all Class Members (a) who are former Solutia employees who have withdrawn their account balances from the Plan and (b) whose Preliminary Dollar Recovery is less than ten dollars ($10.00) ("De Minimis Claimants").

•      The Claims Administrator will identify all Class Members who are Defendants or named fiduciaries of the Plan during the Class Period ("Excluded Claimants").

•      All De Minimis Claimants and Excluded Claimants shall receive an allocation from the Net Proceeds of zero.  The aggregate Preliminary Dollar Recovery that would otherwise have been allocable to such persons (the "Zero Amounts") shall be redistributed pro rata to all other Class Members ("Eligible Claimants").  The Claims Administrator will then calculate a "Final Dollar Recovery" for each Eligible Claimant by adding the Eligible Claimant's pro rata share of the redistributed Zero Amounts to his or her Preliminary Dollar Recovery.

97.    Under the above Plan of Allocation, a Class Member's share of the Net Proceeds depends generally on the dollar value of the Participant's interest in the Solutia Stock Fund held in his or her Plan account during the Class Period and the amount that he or she lost as a result.  The formula takes into account purchases and sales of shares in the Solutia Stock Fund made to and from the account during the Class Period.  In general, the more a Class Member lost because of the decline in value of the Solutia Stock Fund in his or her 401(k) Plan account, the larger that his or her share of the Net Proceeds will be.

98.    Under this methodology, Class Members are not required to do anything to receive their portion of the Settlement.  The Plan Administrator already possesses all information needed to produce an accurate allocation.  Further, with the assistance of experts in data analysis, Class Counsel will help oversee all record compilation and allocation calculations.

99.    Class Counsel, having overseen numerous ERISA class action settlements, believes that the proposed allocation methodology treats all qualifying Class Members uniformly and therefore fairly.  Moreover, this basic approach is a common allocation plan for ERISA company stock settlements, is regularly approved by judges and has been approved by U.S. Trust.  It is Class Counsel's understanding that this methodology has worked well in those cases, and Class Counsel believes it will serve Class Members well here.

### D.    Notice Campaign

100.  In conformity with the Court's May 28, 2008, Findings and Order Preliminarily Approving Class Action Settlement (the "Preliminary Approval Order"), the Class Notice was modified to reflect the handwritten directions of the Court.

101.  To effectuate the notice campaign, Class Counsel, with the Court's approval, retained Gilardi & Co. LLC ("Gilardi") as Claims Administrator.  Gilardi is a claims administrator experienced in class action litigation.  Class Counsel has worked with Gilardi previously in several analogous matters.

102.  On July 16, 2008, Gilardi printed and mailed the Class Notice to the last known address of all Class Members and caused the Class Notice to be published on its website. Attached hereto as Exhibit K is a true and correct copy of the Declaration of Jenny Trang, attesting to Gilardi's efforts in connection with the notice campaign.

## IV.    FINAL APPROVAL OF THE SETTLEMENT IS WARANTED

103.  The proposed Settlement was achieved after years of litigation and months of negotiations.  There were numerous claims and filings in three courts, and the parties scrutinized and thoroughly vetted each facet of the Settlement.

104.  The Second Circuit considers nine factors for determining whether a proposed class action settlement is fair, reasonable, and adequate:

(1)  the complexity, expense and likely duration of the litigation;
(2)  the reaction of the class to the settlement;
(3)  the stage of the proceedings and the amount of discovery completed;
(4)  the risks of establishing liability;
(5)  the risks of establishing damages;
(6)  the risks of maintaining the class action through the trial;
(7)  the ability of the defendants to withstand a greater judgment;
(8)  the range of reasonableness of the settlement fund in light of the best possible recovery; and,
(9)  the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*See City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974).

105.  Before discussing the *Grinnell* factors, it bears noting that the Settlement has been reviewed by U.S. Trust, as an Independent Fiduciary of the Plan, and that U.S. Trust – subject to certain non-material modifications to the Settlement Agreement which all parties have agreed to – has concluded that the Settlement is reasonable.  Accordingly, U.S. Trust has authorized the consummation of the Settlement and has granted the releases contained therein. A copy of U.S. Trust's report is attached hereto as Exhibit L.

### A.    The Complexity, Expense, And Likely Duration Of The Litigation

106.  The parties vigorously litigated these three related matters for nearly four years, addressed novel legal questions and spent over $220,000 prosecuting these actions.  There is little question that this litigation was complex, expensive and lengthy.

### B.    The Reaction Of The Class To The Settlement

107.  The parties fully complied with the Notice requirements in this Court's Preliminary Approval Order.

108.  As of the date of this Joint Declaration, no Class Member has lodged any objection to any aspect of the Settlement.

### C.    The Stage Of The Proceedings And The Amount Of Discovery Completed

109.  The parties engaged in extensive litigation and motion practice over the course of four years.  In addition, because certain of the facts that Plaintiffs needed to prove liability were also relevant in Solutia's bankruptcy proceedings and in the claims made by the Equity Committee in those proceedings, Class Counsel were able to consider those facts as they became known in order to assess the likelihood of success on the merits.

### D.    The Risks Of Establishing Liability And Losses To The Plan

110.  Unlike in many other types of cases, where over time a clear path for resolution and trial has been established, these cases present numerous complex questions of law, with splits among the circuit courts as to the circumstances in which the cases may proceed at all, complex questions of proof as to the circumstances where a fiduciary must act to halt new purchases of company stock, sell company stock already held or take other action, and require multiple experts on fiduciary duties, GAAP and public disclosures, and the financial condition of the company.  These case are made more complex because ERISA exempts such plans from its diversification requirements.  29 U.S.C. § 1104(a)(2).

111.  While there have been numerous settlements in these cases, very few have been tried and Class Counsel are aware that in the three cases that were tried, all of the plaintiffs lost on the merits.  While there was no dispute that the Plan suffered losses from its investment in Solutia common stock, proving that those losses were attributable to fiduciary breaches would be difficult.

112.  The difficulty in assessing recoverable losses here cannot be overstated.   While Plaintiffs' allegations included an estimated loss of $290 million, this represented the most

optimistic and far reaching loss value that was supported by the publicly available information.

Proving these losses would have been an arduous task, requiring Class Counsel and their

experts to perform numerous intricate calculations based on differing assumptions and

parameters, in order to determine the extent of losses caused by fiduciary wrongdoing. This is

a time consuming and expensive process. Defendants would certainly present alternative

analyses to rebut Plaintiffs' calculations. Following the proverbial "battle of the experts," the

Court as finder of fact would have to determine whether Plaintiffs' analyses or Defendants'

analyses were more persuasive.

113. Defendants would also vigorously contest Plaintiffs' proffered proof of losses

because the later the date of the onset of imprudence found by the Court, the lower the losses

attributable to the fiduciary breaches. While Plaintiffs' alleged that Solutia stock was an

imprudent investment from the day that Solutia and the Plan were established, not only did

Defendants contest that allegation but the Bankruptcy Court also expressed skepticism about

such a finding. As Judge Beatty explained to Class Counsel on multiple occasions:

> . . . based on the alleged numbers it would but I'm not exactly sure how the
> numbers are calculated. And as I say, I'm not sure at all that one would choose --
> that one could based on anything I know, that one could go back as far as the
> original split of the company. I think one might have to go for a shorter period of
> time.

Transcript of Hearing, dated July 10, 2007, at 59:17 to 59:22.

> I don't see where the claim would ever be fixed at a number that would go back to
> the original date of the creation of Solutia. It would probably be some intervening
> period . . . .

Transcript of Hearing, dated July 17, 2007, at 64:7 to 64:10.

114. In addition, the market's recent poor performance has hurt claims for higher

losses based on the performance of other investments in the Plan or market. While we believe

that we could prove that there were significant losses to the Plan that exceeded the losses recovered under the proposed Settlement, we are fully cognizant of the time, effort and expense required to do so, typically through the use of expert testimony, as well as the risk of failure.

115.  Finally, while the DOL's investigation concluded that some Plan fiduciaries breached their duties to monitor other Plan fiduciaries, the DOL did not determine that there were any losses to the Plan nor did it assess any monetary penalty or fine on Solutia.

116.  This Court could find, as many already have, that the fiduciaries did not know whether the company would survive until the brink of bankruptcy.  *See DiFelice v. U.S. Airways, Inc.*, 436 F.Supp.2d 756 (E.D.Va. June 26, 2006), *affirmed,* 497 F.3d 410 (4th Cir. 2007) ("*DiFelice*") (Fourth Circuit affirmed the district court's ruling that defendants did not breach ERISA mandated fiduciary duties by continuing to offer company stock as plan investment option.); *Nelson v. IPALCO Enterprises, Inc.*. 480 F.Supp.2d 1061(S.D.Ind. March 28, 2007) ("*Nelson*") (court determined Defendant fiduciaries did not breach their fiduciary duties under ERISA by failing to remove company stock as a plan investment option); *Landgraff v. Columbia/HCA Healthcare Corp. of Am.,* 2000 WL 33726564 (M.D.Tenn. May 24, 2000).  Because this action involves claims for relief under theories of recovery that are still in the process of jurisprudential development, Plaintiffs' ability to prevail on liability is not assured.

117.  Consideration of these factors, as well as of the additional factors discussed below, led Class Counsel to recommend the proposed Settlement.

### E.    The Risks Of Maintaining The Class Action Through Trial

118.  These cases present many unresolved issues at the time that these actions were filed and the Settlement was reached, including whether the claim filed in the bankruptcy could

be pursued on behalf of a class, whether the Dickerson Action could be certified on behalf of the Plan participants identified in the Class and whether the Reiff Action was timely filed with respect to most of the Plan's losses. There was also the risk that this Court could ultimately have determined that the Class Period should have been shorter than that proposed by Plaintiffs, decreasing the recoverable losses by narrowing the period of Defendants' alleged wrongdoing.

### F.    Defendants' Ability To Withstand A Greater Judgment

119.  Defendants' ability to withstand a greater judgment was an important factor in Class Counsel's assessment of whether the proposed settlement is fair, adequate, and reasonable.

120.  Part of the Settlement is funded by the Bankruptcy Claim. That claim was disputed by Solutia and the unsecured creditors.

121.  The cash portion of the Settlement is being funded by Solutia and Solutia's fiduciary insurer. The insurance policy that is paying the cash portion of the Settlement is a wasting policy which covers both litigation costs *and* any resulting settlement or judgment. Hence, as Defendants' litigation costs increase, the funds available to cover a settlement or judgment decrease. Therefore, even if Plaintiffs were able to secure a greater judgment following trial on the merits than they would secure in this settlement, there is a risk that insufficient funds would be available under Defendants' insurance policy to satisfy that judgment. Moreover, given the maximum potential liability, it is doubtful that any of the individual Defendants could meaningfully contribute to a settlement fund once the insurance proceeds were expended.

G.    **The Range Of Reasonableness Of The Settlement Fund
       In Light Of The Best Possible Recovery And All The
       Attendant Risks Of Litigation**

122.  The Settlement confers a substantial benefit on the Class:  a cash payment of $4,750,000.00 and an allowed unsecured claim of $6,650,000.00 against Solutia's bankruptcy estate.

123.  Before entering into the Settlement, Class Counsel considered the uncertain outcome and the risk of any litigation, especially in a complex action such as this one, as well as the difficulties and delays inherent in such litigation.  Class Counsel were mindful of the risks that would attend continued litigation, including inherent problems of proving liability and losses,  potential limitations on recovery due to Solutia's bankruptcy, and the fact that continued litigation would deplete the insurance coverage that would also fund a settlement or judgment.  These factors all weigh in favor of approving the final settlement.

## V.    CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES

A.    **Introduction**

124.  Class Counsel respectfully requests a fee award of thirty percent (30%) of the Settlement Fund and reimbursement of expenses totaling $223,379.07.

125.  This request is consistent with established precedent in this District, throughout the Second Circuit, and in federal courts throughout the country.  Fee awards equal to the requested fee percent have been consistently awarded in class actions to plaintiffs' counsel working on a contingent fee basis who obtain a common fund for the benefit of the class.

126.  A percentage of the fund method is particularly appropriate in this case in light of the fluctuating value of the Settlement Fund because it aligns counsel's compensation with the benefits obtained for the Class and prevents a compensation award that is too high or too low.

In addition, the requested fees are fair and reasonable in light of the criteria followed in the Second Circuit, as set forth below, and are consistent with fee awards in comparable cases.

127.  It also bears noting that Class Counsel themselves have received 30% fee awards – or higher – in analogous ERISA employer stock class action settlements.  For example, both SG and SFD&P (serving as co-lead counsel) recently received a fee award of 30% in *In re RCN Corp. ERISA Litig.,* No. 04-cv-5068 (D.N.J.) ($5,375,000 settlement).  In addition, SG has received fee awards of 33.3% in two other similar ERISA employer stock class actions:  *In re Ferro Corp. ERISA Litig.*, No. 05-cv-1594 (N.D.Ohio) ($4,000,000 settlement); and *Francis v. Comerica Inc., et al.*, No. 05-cv-74038 (E.D.Mich) ($2,020,000 settlement).  Likewise, prior to forming SFD&P, Ms. Doyle had received fee awards of 30% in several ERISA employer stock cases: *Koch v. Dwyer*, No. 98-cv-5519 (S.D.N.Y.) ($6,400,000 settlement); *Kling v. Fidelity Mgt. Trust Co.*, No. 01-cv-11939 (D.Mass.) ($10,850,000 settlement); *Blyler v. Agee*, No. 97-cv-332 ($21,000,000 settlement).

### B.    Relevant Factors

128.  Courts in the Second Circuit consider six factors when evaluating a request for attorneys' fees constituting a percentage of the settlement fund.  These factors include:

(1)    counsel's time and labor;
(2)    the litigation's complexities and magnitude;
(3)    the litigation risks;
(4)    the quality of the representation;
(5)    the relationship of the requested fee to the settlement; and,
(6)    public policy considerations.

### 1.    Counsel's time and labor expended

#### a.    Class Counsel's efforts

129.  Class Counsel has spent roughly four years and a total of 4,651.75 hours prosecuting these claims on behalf of the Class.  Class Counsel investigated and brought these

claims; prepared complaints, proofs of claim, and other initiating documents; briefed motions to dismiss and objections to Plaintiffs' proofs of claims; filed numerous motions for various forms of relief; objected to the release of these claims in the bankruptcy court; fully briefed an appeal; and settled claims pending in multiple courts.

130.  In litigating these claims, Class Counsel has made every effort to act efficiently and economically in an effort to avoid duplication.  Assignments were delegated among firms and within firms to minimize cost and avoid duplication.  However, the inherent complexity of class actions, and those asserting breach of fiduciary duties under ERISA specifically, require a significant amount of time and effort by attorneys to properly investigate, research, litigate and settle these claims.

131.  Class Counsel was obliged to research a large number of legal issues.  These included not only the statutory standing issues that were central to the Court's dismissal of the Dickerson Action and to the resulting appeal, but also issues involving fiduciary obligations, plan sponsor obligations, trustee obligations, statutes of limitations, tolling, pleading amendments, consolidation, withdrawal of bankruptcy reference, and a host of other bankruptcy related issues, including, most importantly, the subordination of Plaintiffs' claims.

132.  Class Counsel's efforts with respect to factual research also were exhaustive. This included not only traditional searches in public filings with the SEC and DOL, but also extensive review of plan documents that the Plaintiffs had and that were obtained from the Plan following the filing of the actions.  This also included a loss analysis.  In addition, Solutia's bankruptcy proceedings presented a vast amount of factual material.  Solutia and the various bankruptcy committees were involved in multiple actions that included significant paper and live testimony.  Class Counsel was obliged to review an enormous number of declarations,

affidavits, disclosure statements, direct examinations, cross-examinations and transcripts. This required a constant monitoring of Solutia's bankruptcy proceedings and the various adversary proceedings that related to it. Ultimately, the strength of some of the facts culled from the Bankruptcy Proceeding allowed this case to settle.

### i.    Class Counsel's Early Efforts

133. The length and complexity of these claims, and their settlement following the filing of a second action in the District Court (i.e., the Reiff Action), makes it easy to forget just how much effort went into the identification of the claims and their initial prosecution.

134. In late 2004 – well before there was any affirmative indication of wrongdoing or any governmental investigation of the Plan – Class Counsel identified and investigated these claims. This involved not only creativity in identifying these valuable claims but tremendous effort in ensuring that they were factually sound, legally cognizable and economically viable. For nearly three years thereafter (before the Reiff Action was filed and settlement discussions began), Class Counsel exhaustively researched and mined every possible factual and legal source in an effort to file and position these claims in a way that would yield the best result for the Class.

135. We were mindful early in this process that significant resources would have to be committed to advance the claims in at least two separate courts since Solutia (which had filed for bankruptcy protection) could only be sued in the Bankruptcy Court for this District. Thus, in an effort to act efficiently, while at the same time maximizing the Class's recovery, we determined to file the claims in this District so as to coordinate the claims and litigation with Solutia's bankruptcy proceedings.

136. Our exhaustive research enabled us to file an amended complaint that described in

extreme detail the factual and legal underpinnings of the claims.  While the Dickerson Action

was dismissed for lack of standing, we remained confident in the merits of the claims and

doggedly pursued the appeal.  In this regard we were successful in persuading the DOL and

AARP to file amicus briefs in support of our position.  Ultimately, it was on the strength of the

Dickerson Appeal and the risk of reversal that settlement talks with Solutia and the Defendants

began.  Indeed, the Dickerson Action and Appeal were so important to the resolution of these

"global" claims that the remand of the Dickerson Appeal to this Court for settlement purposes

became a condition to the finality of the Settlement Agreement.  *See* Settlement Agreement

(Ex. A) at ¶2.5 (Condition #5: Remand of the Dickerson Litigation).

137.  Class Counsel's early efforts in investing, prosecuting and appealing the

Dickerson Action, also helped in prosecuting the claims against Solutia in the Bankruptcy

Court.  Because of these early efforts we were able to file a timely proof of claim against

Solutia – the only one that was filed on behalf of the Plan – to recover losses from Solutia's

estate caused by the alleged fiduciary breaches.  We amended that proof of claim as our factual

investigation revealed additional information.

## ii.    Class Counsel's Later Efforts

138.  In May of 2007, shortly following the oral argument in the Dickerson Appeal, a

year after Solutia began its emergence from bankruptcy, months after we filed objections in

connection with that emergence, and roughly two and a half years after the Dickerson Action

had been filed, we were presented with the opportunity to file a second action in the District

Court with a current employee of Solutia and someone who still had a Plan account.

139.  While we were hopeful that the Second Circuit would find that Dickerson had

standing to bring these claims, we were mindful of the affect an unfavorable decision would

have on the Class's ability to recover its losses. Thus, we took the step of filing a second action in the District Court on behalf of Roger Reiff. We also amended and augmented Mr. Reiff's proof of claim in the Bankruptcy Court to include these ERISA claims.

140. The complaint in the Reiff Action, and Mr. Reiff's amended proof of claim, was predicated on our initial and ongoing investigation in connection with the Dickerson Action. Mr. Reiff could not have been vetted so quickly, nor could the Reiff Action (and his amended proof of claim) have been filed to fast, were it not for the Dickerson Action, our ongoing investigation and the experience we had amassed as a result.

141. Because of the timing of this new action we faced a possible statute of limitations problem. Indeed, when Defendants responded to the complaint in the Reiff Action, one of their principle (and most aggressive) arguments was that the claims were time barred. As a result, we had to research the issue of ERISA's statute of limitations provisions to ensure that the claims we were filing were not stale.

142. At around the time of the filing of the Reiff Action, the proceedings in the Bankruptcy Court – Solutia's pending subordination motion and our various objections to the latest iteration of the disclosure statement – allowed the parties to begin discussing a possible settlement. Concurrently, several Circuit Courts of Appeal were issuing rulings that supported Dickerson's standing and we brought all of these decisions to the Second Circuit's attention. The strength of the Dickerson Appeal – and the pressure that was building in favor of its reversal – were thus aiding in bringing about an early resolution.

143. While settlement discussions were ongoing with Solutia in the Bankruptcy Court, Defendants moved to dismiss the Reiff Action. In an effort to minimize costs and allow the parties to focus on a possible settlement, we proposed to stay further briefing of the motions to

dismiss the Reiff Action.  Unable to reach an agreement with the Defendants, we had to devote substantial time preparing opposition papers. Shortly after we filed our opposition papers, however, a settlement in principle was reached and further briefing on the motions to dismiss was stayed.

### iii.    Finalizing the Settlement

144.   Finalizing the settlement terms and coordinating the resolution of multiple claims in multiple courts was no easy task.  This process commenced in late 2007 and did not conclude until May 2008.  The process included numerous conferences not only with counsel to the parties but with the Bankruptcy Court, Staff Counsel for the Second Circuit and numerous outside vendors (including the Plan's record keepers and the claims administrator).

145.   After months of work and numerous different settlement agreements and revisions, a settlement agreement was reached that provided for the mechanism and relief that a "global" resolution required.

### b.    Lodestar cross-check

146.   In addition to analyzing Class Counsel's time and labor, courts perform a lodestar "cross-check" on the reasonableness of the requested percentage.  This method involves multiplying the number of hours worked by a reasonable hourly rate, and analyzing the reasonableness of the resulting multiple.

147.   The number of hours worked (4,651.75) multiplied by the current hourly rates charged by Class Counsel, equates to a lodestar of $1,881,212.50.  A breakdown of each attorney, respective firm, position, year of admission, hours, hourly rate and lodestar is as follows:

| Attorney | Firm | Position | Admitted | Hours | Rate | Lodestar |
|----------|------|----------|----------|-------|------|----------|
| Ronen Sarraf | SG | Partner | 2000 | 1,563.75 | $495 | $774,056.25 |
| Joseph Gentile | SG | Partner | 2003 | 249.80 | $435 | $108,663.00 |
| **Total SG** | | | | **1,813.55** | | **$882,719.25** |
| Ellen Doyle | SFD&P | Partner | 1975 | 217.10 | $475 | $103,122.50 |
| John Stember | SFD&P | Partner | 1975 | 1.90 | $475 | $902.50 |
| Pamina Ewing | SFD&P | Partner | 1990 | 43.25 | $425 | $18,381.25 |
| Stephen Pincus | SFD&P | Partner | 1993 | 28.50 | $425 | $12,112.50 |
| Jonathan Cohn | SFD&P | Senior Associate | 1997 | 1.00 | $390 | $390.00 |
| Joel Hurt | SFD&P | Senior Associate | 2000 | 132.65 | $375 | $49,743.75 |
| David Kernan | SFD&P | Paralegal | n/a | 1.50 | $125 | $187.50 |
| Kara O'Brien | SFD&P | Paralegal | n/a | 1.50 | $125 | $187.50 |
| **Total SFD&P** | | | | **427.40** | | **$185,027.50** |
| Ellen Doyle | MDF | Partner | 1975 | 369.00 | $490 | $180,810.00 |
| Michael Malakoff | MDF | Partner | 1970 | 1.50 | $490 | $735.00 |
| Richard Finberg | MDF | Partner | 1973 | 284.30 | $490 | $139,307.00 |
| Bradley Gelder | MDF | Associate | 1976 | 85.50 | $325 | $27,787.50 |
| Joel Hurt | MDF | Associate | 2000 | 150.50 | $300 | $45,150.00 |
| James Moore | MDF | Associate | 1994 | 1,018.00 | $300 | $305,400.00 |
| Daniel Bushell | MDF | Associate | 2002 | 251.25 | $250 | $62,812.50 |
| Kathleen Davies | MDF | Associate | 1996 | 159.00 | $240 | $38,160.00 |
| Tom Buzzard | MDF | Paralegal | n/a | 80.50 | $145 | $11,672.50 |
| David Kernan | MDF | Paralegal | n/a | 11.25 | $145 | $1,631.25 |

| Total MDF | | 2,410.80 | | $813,465.75 |
|---|---|---|---|---|
| TOTAL | | 4,651.75 | | $1,881,212.50 |

148.  The time and services for which fees are sought are reflected in the contemporaneously maintained records of each firm.  All of the services performed by Class Counsel in connection with these proceedings were reasonable and necessary in the prosecution of these cases.  No time is included in the fee petition for work in connection with the fee and expense application or accompanying documents, including this Joint Declaration.

149.  The above lodestar calculations are based on current rates.  For attorney(s) who are no longer employed by our firms, the lodestar calculation is based on billing rates for such attorney(s) on his or her final day of association with the firm.

150.  The lodestar figures do not include charges for expense items.  Expense items are billed separately and such charges are not duplicated in the firm's billing rates.

151.  Pursuant to the Court's Preliminary Approval Order, the attached Exhibits B through D include detailed records for each attorney who worked on these matters and a summary of the total hours by month expended on 1) fact research, 2) legal research, 3) pleadings, 4) discovery, and 5) settlement.  Because certain time entries included multiple activities and/or activities which could not readily fit into each the categories identified by the Court, Class Counsel used their best efforts to review each attorney's time entry and designate to which activity each related.

### c.    The reasonableness of class counsel's rates

152.  Numerous courts around the country have approved Class Counsel's hourly rates in awarding fees in class action cases.  Class Counsel's rates are at or below the usual and

customary hourly rates charged for ERISA breach of fiduciary duty and other complex

litigation.  No upward adjustment in billing rate was made, notwithstanding the contingency

and risk of the matters involved, the opposition encountered, the preclusion of other

employment, the delay in payment, or other factors present in this case which would justify a

higher hourly rate.

153.  These rates are also at or below the rates charged by defense counsel in these

actions.  Based on public filings by Solutia in connection with its bankruptcy proceedings, the

hourly rates charged by counsel for Solutia who were involved in these proceedings are as

follows:

| Attorney | Position | Year Admitted | Department | Rate |
|---|---|---|---|---|
| Jonathan Henes | Partner | 1997 | Restructuring | $795 |
| Michael Cohen | Partner | 2000 | Restructuring | $625 |
| Peter Bellacosa | Partner | 1989 | Litigation | $620 |
| Colin Adams | Partner | 2000 | Restructuring | $605 |
| Jeffrey Zeiger | Associate | 2001 | Litigation | $520 |

154.  This chart demonstrates that Class Counsel's rates – based on comparative years

of practice – are lower than those charged by defense counsel in these actions.

### d. The reasonableness of the multiplier

155. It is well established that where counsel assumes the risk of non-payment, any

lodestar calculation should include a "multiplier" that reflects this risk, the result achieved, the

quality of representation, and the complexity and magnitude of the litigation. Thus, in

performing a cross-check on the percentage of the fund fee request, courts often calculate, and

determine the reasonableness of, the resulting multiplier.  For example, if a petitioner's

lodestar was $1,000,000 and the fee request resulted in a $3,000,000 award, there would be a

3.0 multiplier. The court would then assess the reasonableness of the 3.0 multiplier in light of

the circumstances of that particular case.

156. This case differs from the usual analysis because the Settlement fund fluctuates

based on Solutia's trading price and thus Class Counsel's fee request of 30% of the fund,

similarly fluctuates. Based on these fluctuations, however, the following chart details the

range of multiples in this case.

| Date | Total Settlement Value | 30% Fee Award | Lodestar | Multiplier |
|------|------------------------|---------------|----------|-----------|
| POR | $9,405,000.00 | $2,821,500.00 | $1,881,212.50 | 1.50 |
| 5/30/08 | $8,026,062.21 | $2,407,818.66 | $1,881,212.50 | 1.28 |
| 6/30/08 | $7,800,044.66 | $2,340,013.39 | $1,881,212.50 | 1.24 |
| 7/30/08 | $8,442,409.76 | $2,532,722.92 | $1,881,212.50 | 1.35 |
| 8/29/08 | $8,746,938.40 | $2,624,081.52 | $1,881,212.50 | 1.39 |
| **Average** | **$8,484,091.01** | **$2,545,227.30** | **$1,881,212.50** | **1.35** |

157. This case thus presents an average multiplier of 1.35, far below what many courts

have found to be reasonable. *See, e.g., Manners v. Am. Gen. Life Ins. Co.,* No. 98-266, 1999

U.S. Dist. LEXIS 22880, at * 93 (M.D.Tenn. Aug. 11, 1999) (awarding multiplier of 3.8 and

observing that "[t]his multiplier is well within the range of multipliers for similar litigations,

which have ranged from 1-4 and have reached as high as 10"); *Enterprise Energy Corp. v.*

*Columbia Gas Transmission Corp.,* 137 F.R.D. 240, 250 (S.D.Ohio 1991) (finding that

multiplier in "2.4-2.6 range" was "reasonable and conservative when compared to similar

cases," and noting multipliers of 4 and 5 in other cases); *In re Cenco, Inc. Sec. Litig.,* 519

F.Supp. 322, 327 (N.D.Ill. 1981) (finding that a multiplier of 4 was appropriate in light of

"high risk factors," including novelty and difficulty of the claims, uncertainty of success,

contingent nature of the case and delay in payment); *See* Stuart J. Logan, Dr. Jack Moshmar,

Beverly C. Moore, Jr., *Attorney Fee Awards In Common Fund* Class *Actions,* 24 CLASS

ACTION REP. 167, 197 (2003) (for the years 2001 to 2003, covering 134 cases, the average

multiplier was 4.35).

158.   In an analogous ERISA company stock class action, which was settled following

the filing of a complaint and before any briefing on a motion to dismiss, this Court found that a

multiplier of 3.8 was appropriate.  *See In re Bristol-Myers Squibb Co. ERISA Litig.*, No. 02-cv-

10129 (LAP).

## 2.    The magnitude and complexity of the litigation

159.   ERISA class actions alleging breach of fiduciary duty claims are novel and

complex.  Further, ERISA jurisprudence is relatively unsettled, especially as cases

procedurally mature and are tried on the merits.  Analogous actions that have proceeded to trial

have resulted in verdicts for defendants.  Plaintiffs' and Class Counsel's agreement to the

proposed Settlement was based in part on this element of unpredictability of outcome.

160.  Establishing liability and losses in an ERISA breach of fiduciary duty case

requires extensive factual and legal investigation and complex loss analysis.

161.   In this matter, Class Counsel thoroughly and methodically investigated the

numerous underlying factual and legal issues related to Plaintiffs' allegations that Defendants'

alleged wrongdoing rendered Solutia stock an imprudent investment for the Plan.  Class

Counsel's vigorous prosecution of this matter throughout the litigation, including extensive

motion practice and voluminous document review, enabled them to aggressively negotiate the

proposed Settlement on behalf of Plaintiffs and the class as a whole.

162.   While obliged to expend extensive time and resources, Class Counsel did their best to staff this case efficiently.  Counsel allocated work so as to avoid duplication.  Where appropriate, work was assigned to associates or paralegals with lower billing rates.  These approaches demonstrate a suitable and appropriate allocation of resources.

163.   In sum, given, in particular, (1) the time needed for merits and expert discovery in this type of case, which involves a complex interplay of trust common law, ERISA-specific jurisprudence and statutory interpretation, federal securities law, and modern portfolio investment theory; (2) the relative paucity of guiding Circuit or Supreme Court precedent; (3) the sheer number of claims brought by Plaintiffs; and (4) the likely need to file, brief, and argue dispositive motions before trial, the advantageous settlement reached by Class Counsel at this stage of the litigation confers a substantial benefit on the Class.

### 3.       The litigation risks

164.   Class Counsel undertook litigation of this matter entirely on a contingent-fee basis.  From the outset, Class Counsel understood that they were embarking on complex, expensive, and probably lengthy litigation, with no guarantee of ever being compensated for the enormous investment of time and money that the case would require.  In undertaking that responsibility, Class Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of this litigation, and that funds were available to compensate staff and to pay the considerable out-of-pocket expenses which such litigation entails.

165.   Meaningful settlements in cases such as this one come about only when defendants and their counsel understand that leading members of the plaintiffs' bar are prepared to, and will, force a resolution on the merits and go to trial.

166.  Because of the nature of a contingent-fee practice, where litigation often consists of "big cases" that last several years, not only do contingent-fee litigation firms have to pay regular overhead, but they also have to advance substantial litigation expenses.  With an average lag time of three to five years before these cases conclude, the financial burden on contingent-fee counsel is far greater than on firms that are paid on an ongoing basis.

167.  These considerations do not account for the real possibility of no recovery.  As discussed above, from the outset, these cases presented a number of risks and uncertainties which could have precluded any recovery whatsoever (e.g., standing, subordination, class certification, fiduciary status, losses, etc).  Law firms handling complex contingent-fee litigation obviously do not always win, and can expend tens of thousands of hours on losing efforts and receive no compensation.

168.  Class Counsel know from personal experience that despite the most vigorous and competent of efforts, success in contingent-fee litigation like this is never assured.  And ERISA company stock class actions like this are no exception.  In fact, of the three cases of this type that have ever proceeded to trial (including one that was brought of one of Class Counsel here) the plaintiffs lost in all of them.  *See DiFelice v. U.S. Airways, Inc.*, 436 F.Supp.2d 756 (E.D.Va. June 26, 2006), *affirmed,* 497 F.3d 410 (4th Cir. 2007) ("*DiFelice"*) (Fourth Circuit affirmed the district court's ruling that defendants did not breach ERISA mandated fiduciary duties by continuing to offer company stock as plan investment option.); *Nelson v. IPALCO Enterprises, Inc.*. 480 F.Supp.2d 1061(S.D.Ind. March 28, 2007) ("*Nelson"*) (court determined Defendant fiduciaries did not breach their fiduciary duties under ERISA by failing to remove company stock as a plan investment option); *Landgraff v. Columbia/HCA Healthcare Corp. of Am.,* 2000 WL 33726564 (M.D.Tenn. May 24, 2000).

169.  Because this action involves claims for relief under theories of recovery that are still in the process of jurisprudential development, Plaintiffs' ability to prevail on liability is not assured.

170.  Class Counsel were also familiar with hard fought lawsuits where, because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of the case, or an adverse decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar have produced no fee for counsel.

171.  For example, in the *Koger* case, a securities class action went to trial and won an $81 million jury verdict against an accounting firm after a 19-day trial in Jacksonville, Florida, only to have the verdict reversed on appeal on loss causation grounds and judgment entered for defendant.  *See Robbins v. Koger Props., Inc.,* 116 F.3d 1441 (11th Cir. 1997).  Similarly, in the *Apple Computer Securities* case, plaintiffs won a substantial jury verdict against two defendants but the district court then vacated the judgment on a motion for judgment notwithstanding the verdict.  *See In re Apple Sec. Litig.,* [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,252 (N.D.Cal. Sept. 6, 1991).

172.  Other such case losses include *Bentley v. Legent Corp.,* 849 F. Supp. 429 (E.D.Va. 1994), *aff'd,* 50 F.3d 6 (4th Cir. 1995) (directed verdict after plaintiffs presentation of its case to the jury); *Radol v. Thomas,* 772 F.2d 244 (6th Cir. 1985), *cert. denied,* 477 U.S. 903 (1986) (summary judgment and jury verdict in favor of defendants in action challenging Marathon/U.S. Steel merger); *Landy v. Amsterdam,* 815 F.2d 925 (3d Cir. 1987) (directed verdict for defendants after five years of litigation; affirmed on appeal); *Krinsk v. Fund Asset*

*Management, Inc.,* 715 F.Supp. 472 (S.D.N.Y. 1988), *aff'd,* 875 F.2d 404 (2d Cir.), *cert. denied,* 493 U.S. 919 (1989) (verdict for defendants after trial).

173.   The many appellate decisions affirming summary judgments and directed verdicts for defendants also show that even where a class action case survives a motion to dismiss, that is no guarantee of recovery.  *See, e.g., Szlver v H&R Block,* 105 F 3d 394 (8th Cir 1997); *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407 (9th Cir. 1994); *Donohoe v. Consolidated Operating & Prod. Corp.,* 30 F.3d 907 (7th Cir. 1994); *Sailor v. Northern States Power Co.*, 4 F.3d 610 (8th Cir. 1993), *McGonigle v. Combs,* 968 F 2d 810 (9th Cir 1992); *Moorhead v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 949 F.2d 243 (8th Cir 1991); *In re Convergent Tech. Sec. Litig.,* 948 F.2d 507 (9th Cir. 1991).

174.   In other class actions, plaintiffs prevail at trial only to find their judgment overturned on appeal. *See, e.g., Anixter v. Home-Stake Prod. Co.,* 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after *24 years* of litigation); *Backman v. Polaroid Corp.,* 910 F.2d 10 (1st Cir. 1990) *(en banc)* (reversing plaintiffs' verdict for securities fraud and ordering entry of judgment for defendants, after 11 years of litigation); *Ward v. Succession of Freeman,* 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' jury verdict for securities fraud); *Trans World Airlines, Inc. v. Hughes,* 312 F. Supp. 478 (S.D.N.Y. 1970) (judgment for $145 million overturned after years of litigation and appeals), *modified,* 449 F.2d 51 (2d Cir. 1971), *rev'd,* 409 U.S. 373 (1973).

175.   Many other cases are lost on summary judgment after thousands of hours have been invested in successfully opposing motions to dismiss and pursuing discovery.  *See, e.g., Eisenstadt v. Centel Corp.,* 113 F. 3d 738 (7th Cir. 1997) (Seventh Circuit affirmed the lower court's granting of summary judgment in favor of defendants); *Scans v. Glasser,* 1994 U.S.

Dist. LEXIS 13509 (N.D.Ill. Sept. 21, 1994), *aff'd,* 64 F.3d 1061 (7th Cir. 1995); *In re Convergent Tech. Sec. Litig.,* 721 F.Supp. at 1133 (summary judgment against plaintiffs following five years of litigation), *aff'd,* 199,1 U.S. App. LEXIS 19733 (9th Cir. Aug. 27, 1991), *amended,* 948 F.2d 507 (9th Cir. 1991).

176.   The risks of contingent litigation also are highlighted by the fact that a dramatic change in the law can result in the dismissal of a claim after counsel have expended a great deal of time and effort on the case.  Many of the issues raised in these cases were novel, and there is limited appellate authority on the nature of the claims asserted.  Many courts have dismissed long pending cases that otherwise stated a proper cause of action at the time they were brought.

177.   Losses such as those described above are exceedingly expensive and can threaten the survival of a law firm.  In addition, attorneys' fees are often shared among several counsel, cover enormous overhead expenses incurred during the course of the litigation, are taxed by federal, state and local authorities, and, when reduced to a bottom line, are far less substantial for each attorney involved than the aggregate fee awarded might appear.

178.   Courts repeatedly have held that it is in the public interest to have experienced and able counsel enforce the labor laws and regulations pertaining to the duties of pension plan fiduciaries.  Vigorous private enforcement of these laws can only occur if private plaintiffs can obtain parity in representation with that available to large institutional interests.  To carry out this important public policy, courts should award fees which adequately compensate private plaintiff's counsel, taking into account the risks undertaken with a clear view of the economics of ERISA class actions.

179.   Another factor is the contingent fee attorney's loss of the use of fees earned, but unpaid, during the course of litigation.  Lawyers representing paying clients receive their fees regularly and immediately.  Those fees are then available to them for investment, which in turn creates additional revenues for them over time.  A contingent fee lawyer loses the use of that money.  Instead of taking on class actions, class action attorneys could spend their time on individual cases where clients pay on an hourly basis, guaranteeing a steady stream of income. But this would deprive people like Class Members here of any meaningful opportunity to seek redress for their losses.

### 4.     The quality of Class Counsel's representation

180.   This Settlement was achieved by Class Counsel experienced and skilled in identifying, investigating, prosecuting, and successfully negotiating a substantial cash award for the Class.  See resumes for Class Counsel's firms and individual attorneys who worked on this cases, attached hereto at Exhibits H and I.  The quality of Class Counsel's representation is best demonstrated by the fact that they obtained a multi-million dollar settlement from a bankrupt entity.

181.   Two law firms served as Class Counsel in this litigation:  Sarraf Gentile LLP ("SG") and Stember Feinstein Doyle & Payne, LLC ("SFD&P").  Each has extensive ERISA litigation experience, has worked closely on other ERISA class actions, and has zealously prosecuted this action and achieved an excellent result.  See firm and individual attorney resumes attached hereto as Exhibits H and I.

182.   The quality of opposing counsel also is relevant when evaluating the quality of class representation.  Here, Defendants were ably represented by some of the country's most respected and prominent firms – Kirkland & Ellis LLP, O'Melveny & Myers LLP and Kramer

Levin Naftalis & Frankel LLP – with extensive expertise and experience in complex litigation, including class actions alleging breach of fiduciary duty claims under ERISA. The fact that Class Counsel was able to negotiate a favorable settlement from Defendants represented by such high caliber legal advocates militates in favor of awarding the requested fee.

**5.      The relationship of the requested fee to the settlement**

183. The 30% fee sought in the instant petition is comparable and consistent with fees routinely approved by courts in this circuit that range between 20% to 33% of the settlement fund.

184. The fee request also is consistent with contingent fees privately negotiated in the marketplace.

185. A one-third (33%) contingency fee is generally standard in individual cases; complex class actions alleging breach of fiduciary duty claims under ERISA are anything but standard. Rather, they entail an extraordinary amount of time and expense to properly research, investigate, file, and litigate. Here, given ERISA's nascent stage of jurisprudential development, especially with regard to litigation through trial on the merits, prosecuting such claims are inherently risky with no guarantee of payment.

**6.      Considerations of public policy**

186. Courts repeatedly recognize the important public interest of having experienced and able counsel enforce the rights of retirees, pensioners, and investors. If this public policy is to be carried out, courts must award fees which will adequately compensate counsel, taking into account the enormous risks undertaken with a clear view of the economics of the situation.

187. This is particularly true of ERISA class actions given the proliferation of retirement plans and the DOL's limited resources in policing them all. In this case, the DOL

took no action until *after* we notified it about our claims.  The Plan's fiduciaries were not going to sue themselves and no other participant in the Plan stepped forward to pursue these claims.  It is thus beyond question that the Class would have received nothing if not for the efforts of Class Counsel.

## VI.    PLAINTIFFS' APPLICATION FOR REIMBURSEMENT OF EXPENSES

188.  Class Counsel requests reimbursement of their out-of-pocket expenses incurred to date in connection with the prosecution of this action.  These expenses include payments to consultants, special bankruptcy counsel and investigative services, photocopying of documents, on-line research, messenger services, postage, telephone and facsimile expenses, transportation, meals, travel, and other incidental expenses directly related to the prosecution of this action.

189.  In total, Class Counsel has incurred a total of $223,379.07 in expenses in connection with the prosecution of this litigation.  The expenses incurred in these actions are reflected on the books and records of our firms.  These books and records are prepared from receipts, expense vouchers, check records and other materials and are an accurate contemporaneous recordation of the expenses incurred.  A listing of these expenses are attached hereto as Exhibits E through G.

190.  Of particular note in this regard was the expense incurred by Class Counsel in hiring the law firm of Lowenstein Sandler PC ("LS") as special bankruptcy counsel in connection with the bankruptcy portion of these proceedings.  Solutia moved to dismiss Plaintiffs' bankruptcy claims on several grounds, including on the theory that these claims were subordinated pursuant to Section 510(b) of the Bankruptcy Code.  The subordination motion raised novel questions of law that implicated not simply statutory language but also

Congressional intent and applicability of Section 510(b) to ERISA breach of fiduciary duty claims. The few courts that have addressed this issue are in conflict. In light of the stakes involved, and the Bankruptcy Court's own publicly disclosed views on some of the terms used in Section 510(b), the Bankruptcy Court urged the retention of specialized bankruptcy counsel to assist Class Counsel. We interviewed and ultimately retained special counsel at the request of the Bankruptcy Court, and paid market rates for such counsel without any assurance that those costs would be recouped.

191. The detailed invoices of Lowenstein Sandler are attached hereto at Exhibit J.

## VII.    CASE CONTRIBUTION AWARDS FOR NAMED PLAINTIFFS

192. Class Counsel respectfully requests that the Court approve the payment of case contribution awards in the amount of $5,000 each for Plaintiffs Jeremy Dickerson and Roger Reiff, in recognition of their time and effort in assisting the prosecution of these actions and conferring benefits upon all other Class members.

193. In addition to stepping forward and filing the instant claims and actions, these individuals provided documents and information essential to the successful prosecution and settlement of this Action. They complied with all reasonable demands and provided significant assistance to Class Counsel as needed in the prosecution of this case.

194. The amount of the awards requested are similar, and in some instances below, those awarded in analogous settlements. *See, e.g.*, *In re Ferro Corp. ERISA Litig.*, No. 05-cv-1594 (N.D. Ohio) (awarding $10,000 to the named plaintiff); *Francis v. Comerica Inc., et al.*, No. 05-cv-74038 (E.D. Mich) (awarding $5,000 each to the two named plaintiffs).

## VIII.    CONCLUSION

195. For the reasons stated herein and in the papers filed herewith, we respectfully

request the final approval of this Settlement and the award of attorneys' fees, expenses and case contribution awards.

196.  Pursuant to 28 U.S.C. § 1746, we declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed this third day of September, 2008:

_____
Ronen Sarraf

_____
Ellen M. Doyle